**BETA ANALYTICS INTERNATIONAL, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 99–222C.**

United States Court of Federal Claims.

June 14, 1999.[1]

---

1. This opinion was issued under seal on May 24, 1999. Pursuant to ¶ 4 of the ordering language, the parties identified protected/privileged material subject to deletion. Brackets denote the deleted material.

Marshall L. Miller, Washington, DC, for plaintiff.

Michael D. Austin, Washington, DC, with whom was Acting Assistant Attorney General David W. Ogden, for defendant. Dennis J. Gallagher and Peter J. Ritenburg, U.S. Department of State, of counsel.

## OPINION

MILLER, Judge.

This post-award bid protest is before the court after argument on cross-motions for judgment upon the administrative record. The most substantial issue is whether the

Government, which encouraged offerors to submit "creative or innovative approaches," violated a mandatory requirement of the solicitation by allowing the awardee to combine the hours for two required labor categories and consolidate the functions of two required supervisory labor categories, although the total number of hours overall was not affected.

## FACTS

On October 8, 1998, the United States Department of State ("State") issued Solicitation Number S–FBOAD–98–R–0042, for "construction security monitoring services at overseas and domestic Department of State construction sites and storage areas." The solicitation combined two prior contracts for Cleared American Guard ("CAG") Services and Construction Security Technician ("CST") services. Section C.2 of the solicitation, "Statement of Work," explains:

The Department of State (DOS) requires Construction Security Personnel (CSP) at various overseas and domestic facilities to detect unauthorized access to internal controlled areas, to deter the introduction of unauthorized materials to the site, and to surveil the activities of uncleared construction workers to prevent the implantation of clandestine surveillance devices or systems into the structure being constructed. The two types of Construction Security Personnel shall be the 1) Cleared American Guards (CAGs) and the 2) Construction Surveillance Technicians (CSTs).

The duties and qualifications of the CAGs include:

provid[ing] perimeter and internal access control, control of secure storage areas, and personnel or material escort within a construction site or to a construction site. CAGs may at times assist in the random selection of materials required for construction and installation. Cleared American Guards will have, at a minimum, a high school diploma and at least three years experience in guard duty or security, preferably with the U.S. military or Government, including an operational knowledge of technical security systems (e.g., alarms, metal detectors, and X-ray devices). Senior Cleared American Guards will have at a minimum 5 years experience.

In contrast, the solicitation sets forth considerably more demanding duties and qualifications of the CSTs:

Construction Security Technicians will surveil uncleared workers during designated phases of construction; x-ray and inspect material, equipment and furnishings designated for use within Controlled Access Areas of a construction site; and assist in the random selection of materials required for construction and installation. Construction Security Technicians will have five (5) years experience in construction surveillance, Technical Surveillance Countermeasures, or prior experience of a technical (electronic) nature; or they will have a minimum of ten (10) years in industrial or government security and/or counterintelligence activities; or five (5) years experience in construction quality assurance or hands on supervisory construction experience.

The solicitation required offerors to submit two separately bound volumes, denoted "Technical" and "Price." The technical volume was divided into three parts: (1) Management Plan, (2) Resumes of Proposed Key Personnel, and (3) Contractor's Past Performance. The price volume required the submission of a price summary and detailed information of each rate proposed in said price summary, taking into consideration all aspects of the offeror's technical approach. For each major subcontract, the solicitation required offerors to provide the same cost proposal presentation using the same formats required of the prime offeror. In order to be considered for contract award, each proposal was required to "fully respond to the requirements of the solicitation." Of particular significance to the procurement, the solicitation encouraged offerors to provide "creative or innovative approaches" to meeting its requirements.

Four offerors responded to the solicitation: plaintiff, [ ], The Cube Corporation ("Cube"), and Rural Electronics Industries Development, [ ] ("Rural Electronics"). State established a three-member Technical Evaluation Panel ("TEP") to evaluate each

offeror's technical volume. State Special Agent Daniel James Power chaired the TEP. Robert M. Jenkins of State and State Special Agent Josef D. Leary were the other panel members. The evaluation process contemplated an adjectival and numerical scoring scheme. For each of the three criteria within the technical volume, *i.e.,* Management Plan, Resumes of Key Personnel, and Contractor's Past Performance, offerors were eligible to receive 30 points, permitting a maximum score of 90 points for the technical evaluation. Each TEP member was directed to support his numerical score with a narrative identifying the strong and weak points for each criterion. The solicitation guidelines stipulated that TEP members first review individually the technical volumes and complete evaluation sheets, then meet and deliberate for the purpose of arriving at a consensus score. The TEP chairman was tasked with preparing a Technical Evaluation Summary Report, including, *inter alia,* "a summary by offeror of the consensus scores assigned for each factor and the narrative technical rationale/basis for assigning these scores," and "whether the overall rating indicates if the Technical Proposal is considered acceptable, could become acceptable or is unacceptable." [2]

The TEP members received their instructions, together with the four proposals, on November 23, 1998. They first scored each proposal individually and then met several times to arrive at a consensus score for each offeror.[3] Based upon the TEP's consensus evaluation, HSI received the highest total score, accumulating 84 out of a possible 90 points. Plaintiff's technical proposal ranked second among the four submitted with a score of 68. The TEP evaluated the remaining two proposals considerably lower, with one proposal deemed unacceptable.

Although HSI received the highest score for its technical proposal, HSI submitted the

**2.** In a memorandum dated November 10, 1998, from Superintendent Walton Marshall Pittman to Mr. Power, Mr. Pittman provided the instructions based, in part, on State's Overseas Contracting and Simplified Acquisition Guidebook, which describes how the TEP should evaluate the technical proposals:

Each member of the technical evaluation panel must read each proposal in its entirety. During the initial evaluation, you should *not* compare different companies against each other at this point; instead, evaluate each company separately against the requirements stated in the solicitation. Each technical evaluator must score each proposal by assigning a rating of low, medium or high. It should be understood that the only time points shall be assigned will be during or after the Consensus Meetings . . . .
. . . .
The evaluation process is designed to be structured, but requires individual judgment on how well each firm meets the requirements of the solicitation. During the evaluation process, consider only the factors and requirements stated in the solicitation; if something is not stated in the solicitation, then you are not allowed to evaluate it. . . .
. . . .
You will be required to prepare and submit to the TEP Chairperson, Clarification Requests (CRs) and Deficiency or Weakness Reports (DWRs) to include weaknesses for each offeror. The Consensus team will summarize by offeror these CRs and DWRs and this summary will be provided to the CO as a separate Attachment when the TEP Chairperson submits the Technical Evaluation Summary Report. CRs and DWRs are extremely important to the source selection process because if negotiations are conducted, they will become the technical basis for discussions and/or the Request for Best and Final Offers. . . .
. . . .
The TEP Chairperson will schedule a consensus meeting for each offeror after all technical evaluators have submitted their CRs and DWRs, evaluation sheets and narratives for all offerors. These documents are critical to the consensus process since they will become the basis for discussion to arrive at numerical scores, narratives and CRs and DWRs through consensus. Furthermore, in the unlikely event that a consensus score cannot be reached for a factor or factors, the TEP Chairperson shall provide a detailed discussion on why consensus could not be reached and assign the points to be used in lieu of the consensus score to include provide [sic] a detailed narrative on how the nonconsensus points were derived.

**3.** Plaintiff contends that, because a meaningful consensus was never reached by the members of the TEP on any of the proposals, the TEP failed to follow the evaluation process outlined in the solicitation. Plaintiff charges that Messrs. Leary and Jenkins merely submitted their individual score reports to Mr. Power, who then drafted the consensus evaluation without further input from the other TEP members. Although the panel members assigned numerical scores before the consensus meeting, contrary to the guidelines, only the deposition testimony of Mr. Jenkins supports plaintiff's characterization.

highest proposed price—$35,346,414.24. Plaintiff's proposed price, $34,740,113.00, was the second highest submitted—$606,301.24 less than HSI's. The Recommendation for Award to HSI, signed by Contract Specialist Walton Marshall Pittman and by Contracting Officer Bonna L. Bonard on January 15, 1999, states:

A. There is a 16 point difference, in the technical scores between the highest scoring (Heritage) and second highest scoring (Beta) offerors....

B. Heritage's total price (base year and options) is approximately $600,000.00 higher than Beta's ....

The COR recommended, that based on the higher technical score, Heritage Services, Inc.'s proposal should be considered to be most advantageous to the Government.

Per Section M.2 "EVALUATION AND SELECTION FOR AWARD", the Contract Specialist reviewed the Narrative Supporting Numerical Scores ... to assess the values of awarding to a higher priced Offeror at a higher technical score versus a lower priced, lower technically rated Offeror.

. . . .

[ ⁴]

[ ]

[ ]

. . . .

[ ]

It is most advantageous to the Government to award to the contractor with the higher price in order to obtain the higher technical capability.

State awarded the contract to HSI on March 1, 1999.[5] During the March 31, 1999 debriefing that plaintiff requested, which was attended by Messrs. Pittman and Power and representatives of plaintiff, Mr. Pittman provided an overview of the award decision, explaining the trade-off analysis employed by the TEP that enabled State to award the contract to a higher priced offeror with greater technical merit. Mr. Power also addressed the weaknesses and deficiencies in plaintiff's proposal. [ ]

Plaintiff submitted its bid protest to the General Accounting Office (the "GAO") on April 5, 1999. On April 13, 1999 plaintiff filed its Verified Complaint for Declaratory Judgment and Preliminary and Permanent Injunctive Relief in the Court of Federal Claims.[6] Plaintiff seeks to prohibit State from "procuring any goods or services under its contract awarded to [HSI]," Compl. filed Apr. 13, 1999, ¶ 9, and "expending any funds except under a contract extended or awarded to the Plaintiff." *Id.* Plaintiff also seeks a judgment declaring the action of State "to be arbitrary, capricious, an abuse of discretion, not in accordance with law and without observance of the procedure required by law, and unwarranted by the facts and substantial evidence in violation of the Administrative Procedure Act, ... the Competition in Contracting Act of 1984, ... [and] the Federal Acquisition Regulation[ ] ...." Compl. ¶ 10.

A hearing was held on plaintiff's application for a temporary restraining order on April 14, 1999.[7] Messrs. Power, Pittman, and Douglas K. Roberts, State Supervisory Specialist for Construction Management, testified for defendant. In its order entered on April 15, the court ruled that interim injunctive relief should not be granted. The court granted plaintiff's motion for expedited discovery because the agency's actions were not adequately explored in the record, including the post-award debriefing. *See GraphicData, LLC v. United States,* 37 Fed.Cl. 771, 779

---

4. []

5. On February 3, 1999, Mr. Pittman notified plaintiff, Cube, and Rural Electronics of State's intention to award the contract to HSI. By letter dated February 5, 1999, plaintiff requested "a post solicitation/selection debriefing." After having been rescheduled at least twice at the request of both plaintiff and State, the debriefing occurred on March 31, 1999.

6. By letter dated April 15, 1999, from the GAO to plaintiff's counsel, the GAO confirmed that, pursuant to the withdrawal of plaintiff's protest, plaintiff's file was closed without further action.

7. HSI intervened solely for the purpose of that hearing and did not participate thereafter.

(1997).[8]

## DISCUSSION

The Tucker Act grants the Court of Federal Claims jurisdiction "to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for ... the award of a contract or any alleged violation of statute or regulation in connection with a procurement or proposed procurement." 28 U.S.C.A. § 1491(b)(1) (West Supp.1998). " '[T]his jurisdictional grant extends to suits brought by disappointed bidders, commonly called bid protests, challenging the proposed award of contracts based on alleged improprieties in the procurement process.' " *Southfork Systems, Inc. v. United States*, 141 F.3d 1124, 1132 (Fed.Cir.1998) (quoting *Central Ark. Maintenance, Inc. v. United States*, 68 F.3d 1338, 1341 (Fed.Cir.1995)). "To afford relief in [a bid protest] action, the courts may award any relief that the court considers proper, including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs." 28 U.S.C.A. § 1491(b)(2) (West Supp.1998).

▮ The standard against which the court measures the procuring agency's conduct is whether the Government's conduct was arbitrary and capricious. *See* 28 U.S.C.A. § 1491(b)(4) ("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5.").[9] The United States Court of Claims, predecessor to the Court of Federal Claims, set forth four factors that pertain to the inquiry under § 1491(b)(4): (1) subjective bad faith on the part of the procuring officials; (2) absence of a reasonable basis supporting the award decision; (3) degree of discretion afforded to procurement officials by applicable statutes and regulations; and (4) violation of a statute or regulation. *See Keco Indus., Inc. v. United States*, 203 Ct.Cl. 566, 574, 492 F.2d 1200, 1203–04 (1974); *see also Southfork Systems*, 141 F.3d at 1132 (recognizing inquiry into *Keco* factors remains valid, although jurisdiction no longer premised on theory of an implied-in-fact contract); *GraphicData*, 37 Fed.Cl. at 779 (explaining frustrated bidder must establish that agency's actions were without reasonable basis or violated applicable procurement statute or regulation to obtain injunctive relief); *PCI/RCI v. United States*, 36 Fed.Cl. 761, 767 (1996) (same); *C & G Excavating, Inc. v. United States*, 32 Fed.Cl. 231, 235 (1994) ("The award of a permanent injunction is appropriate whenever a party can demonstrate by 'a preponderance of the evidence that the challenged action is irrational or unreasonable or violates an applicable procurement [statute or] regulation.' ") (quoting *Logicon, Inc. v. United States*, 22 Cl.Ct. 776, 783 (1991)). "[N]ot all violations of statute and regulation are the same; only a 'clear and prejudicial' violation of a procurement statute or regulation warrants relief." *Central Ark.*, 68 F.3d at 1342 (quoting *CACI Field Servs., Inc. v. United*

---

8. The courts have developed a number of exceptions to the general rule limiting review to the administrative record:

 (1) when agency action is not adequately explained in the record before the court; (2) when the agency failed to consider factors which are relevant to its final decision; (3) when an agency considered evidence which it failed to include in the record; (4) when a case is so complex that a court needs more evidence to enable it to understand the issues clearly; (5) in cases where evidence arising after the agency action shows whether the decision was correct or not; (6) in cases where agencies are sued for a failure to take action; (7) in cases arising under the National Environmental Policy Act; and (8) in cases where relief is at issue, especially at the preliminary injunction stage.

*Esch v. Yeutter*, 876 F.2d 976, 991 (D.C.Cir. 1989).

9. The reviewing court in a bid protest action may

 hold unlawful and set aside agency action, findings, and conclusions found to be—

 (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

 (B) contrary to constitutional right, power, privilege, or immunity;

 (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

 (D) without observance of procedure required by law;

 (E) unsupported by substantial evidence ...; or

 (F) unwarranted by the facts to the extent that the facts are the subject to trial de novo by the reviewing court.

5 U.S.C.A. § 706 (West 1996).

*States*, 854 F.2d 464, 466 (Fed.Cir.1988)). Because the court should exercise its equitable powers in a manner that best limits judicial interference in the procurement process, injunctive relief is appropriate " 'only in extremely limited circumstances.' " *CACI, Inc.–Fed. v. United States*, 719 F.2d 1567, 1581 (Fed.Cir.1983) (quoting *United States v. John C. Grimberg Co.*, 702 F.2d 1362, 1372 (Fed.Cir.1983)).

 The existence of errors or oversights in the evaluation process does not necessarily indicate an abuse of discretion:

> The mere failure to exercise due diligence in the appraisal of the advantageousness of a competitor's bid, when the omission amounts to simple negligence, is not a sufficient showing of arbitrary or capricious conduct . . . . [L]itigation which second-guesses bid determinations, through efforts to show ordinary lack of due care in appraising competing proposals, should not be encouraged where the award was rational and made in good faith. The interference from such suits, and their impact upon contracting activities, would exact too great a price on the procurement process.

*Keco Indus.*, 203 Ct.Cl. at 579, 492 F.2d at 1206–07; *accord E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed.Cir.1996) (explaining that technical rating decisions are the "minutiae of the procurement process . . . which involve discretionary determinations of procurement officials that a court will not second guess"). The aggrieved party faces a higher burden in a negotiated procurement in which procurement officials are granted a great deal of discretion. *See Burroughs Corp. v. United States*, 223 Ct.Cl. 53, 65, 617 F.2d 590, 597–98 (1980). In particular, it is well established that the scoring of proposals within the competitive range fall within the discretion of the agency evaluator.

*See Harris Data Communications, Inc. v. United States*, 2 Cl.Ct. 229, 241 (1983). "In reviewing [plaintiff's] protest of the agency's technical evaluation and decision to eliminate an offeror from the competitive range, we will not evaluate the proposal anew, but instead will examine the agency's evaluation to ensure that it was reasonable and in accord with the evaluation criteria listed in the solicitation." *Beneco Enterprises, Inc.*, 70 Comp. Gen. 574, 576 (1991); *see Harris Data Communications*, 2 Cl.Ct. at 241. In sum, the protestor must demonstrate significant, prejudicial error in the procurement process. *See Statistica Inc. v. Christopher*, 102 F.3d 1577, 1581 (Fed.Cir.1996). To establish prejudice, the protestor need not show that "but for the alleged error the protestor would have been awarded the contract." *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir.1996). "Rather, the protestor must show 'that there was a substantial chance it would have received the contract award but for that error.' " *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365 (Fed.Cir.1999) (quoting *Statistica*, 102 F.3d at 1582).[10]

The Federal Circuit's recent decision in *Alfa Laval* is instructive insofar as plaintiff's protest is based on State's alleged failure to apply evenly a mandatory provision of the solicitation. In that case, the trial court determined, *inter alia*, that the agency awarded the contract to an offeror that had not complied with a mandatory solicitation provision. Although the provision had minor technical impact on the award, the court was constrained to find a clear violation of a mandatory procurement statute and regulation. However, the court pointed out that the Federal Circuit had adopted a *de minimis* rule for bid protests under another bid protest statute, *see Alfa Laval Separation, Inc. v. United States*, 40 Fed.Cl. 215, 234 n.

---

**10.** The standard of proof is high. *See E.W. Bliss*, 77 F.3d at 447; *Lincoln Servs. Ltd. v. United States*, 230 Ct.Cl. 416, 417–18, 678 F.2d 157, 158 (1982). However, despite defendant's contention's to the contrary, the aggrieved bidder need not prove the arbitrary and capricious nature of the Government's actions by clear and convincing evidence. Injunctive relief may be warranted upon the lesser showing of a preponderance of the evidence. *See R.R. Donnelley & Sons, Co. v. United States*, 38 Fed.Cl. 518, 521–22 (1997);

*GraphicData*, 37 Fed.Cl. at 779; *PCI/RCI*, 36 Fed.Cl. at 767; *Stapp Towing Inc. v. United States*, 34 Fed.Cl. 300, 305 (1995); *C & G Excavating*, 32 Fed.Cl. at 235; *Logicon*, 22 Cl.Ct. at 783. Regarding allegations of bad faith, plaintiff's burden of proof increases because agency officials are presumed to act in good faith. Such allegations must be supported by "well-nigh irrefragable proof." *Kalvar Corp. v. United States*, 211 Ct.Cl. 192, 198, 543 F.2d 1298, 1301 (1976).

23 (1998) (citing cases), which the appeals court could extend to the Tucker Act. Because the protestor's prices vastly exceeded those of the awardee—and, indeed, were higher than those the agency earlier had rejected from the protestor—the trial court found that the violation did not effect a prejudice upon the protestor.

■ In its reversal and remand, the Federal Circuit declined to adopt the position that an award decision may remain undisturbed, despite a procurement violation implicating a mandatory provision, even if the violation is *de minimis.* The appeals court explained that procuring officials' views regarding the appropriateness of standards set forth in the solicitation cannot relieve the agency from mandatory terms of a solicitation. *See* 10 U.S.C. § 2305(b)(1) (1994) ("The head of an agency shall evaluate sealed bids and competitive proposals and make an award based solely on the factors specified in the solicitation."). Thus, if a protestor can demonstrate an instance in which a procuring official failed to abide by a mandatory solicitation provision, the protestor will prevail, provided it can demonstrate that, but for the violation, it had a substantial chance to receive the award.

■ [ ] Section B.3 "PRICES/COSTS" states:

*The contractor shall provide the following labor categories of labor for performance of the· work set forth in the schedule.* No adjustment in the firm fixed hourly rate will be made as a result of any variation in the estimated other direct costs. The hourly rates specified for this contract and its four option years shall be fixed hourly rates . . . .

In no event shall the contractor exceed the total estimated number of labor hours, per labor category, without prior written approval of the Contracting Officer.

(Emphasis added.) Section B.4 defines four labor categories and specifies the number of estimated hours for each category for year one of the contract: Senior Cleared Ameri-

can Guard—18,758 hours; Cleared American Guard—79,196 hours; Team Leader—Construction Surveillance Technician—10,496 hours; and Construction Service Technician—39,867 hours.

The questions and answers memorialized from the October 23, 1998 pre-proposal conference, attended by representatives of plaintiff, HSI, and Coastal International Security, Inc. ("Coastal"), subcontractor to HSI, further reinforced the solicitations's requirements regarding the mandatory structure and pricing of the labor categories:

QUESTION 1: There is no provision in Section B for identifying or pricing a management team. How does the Department want these positions identified and priced in Section B?

ANSWER: The Department has provided the required labor categories and a description of the work to be performed. Offerors are encouraged to provide creative or innovated approaches to meeting the requirements of the solicitation. *The "Number of Hours" in the specified labor categories in Section B may not be changed.* Offerors are encouraged to clearly identify the managerial and administrative positions. The cost for such personnel can be included as additional line items or included in the indirect cost.

(Emphasis added.) [11]

Responding to State's encouragement to provide "creative or innovative approaches" to meeting the solicitation's requirements, and in furtherance of HSI's commitment to "provide a professional, consistent and cost-effective service that exceeds expectation, [ ]

[ ]

[ ]

[ ] These are precisely the types of alterations proscribed by the solicitation's language and the express instructions announced at the pre-proposal conference.

[ ]

[ ]

[ ]

11. Defendant argued that plaintiff's interpretation of the solicitation amounted to identification of a patent ambiguity. Assuming, *arguendo,* that

was the case, the question from a contractor sufficed to notify State of the putative ambiguity, which State definitively construed in its answer.

Notwithstanding its concessions, defendant's argument misses the point. The dispositive issue is not whether HSI's proposal was reasonable, but whether it complied with the mandatory requirements of the solicitation. Three of the four offerors, including plaintiff, interpreted the language regarding the labor categories and the allocation of hours to be restrictive and inflexible. The solicitation's use of terms such as "shall" and "must," as opposed to, for example, "should" or "may," reinforces plaintiff's interpretation that a compliant proposal required four distinct labor categories, each performing the number of hours set forth in the solicitation. It was well within the province of the solicitation's drafters to encourage creative or innovative approaches in responding to the solicitation, as it was within the province of the TEP to give HSI's proposal a higher technical rating. Nonetheless, the error was significant because the TEP consensus emphasized that HSI's approach to management distinguished HSI's proposal from its competitors with respect to all three criteria that governed evaluation of technical proposals—Management Plan, Resumes of Key Personnel, and Contractor's Past Performance.[12]

A procuring agency is not without recourse if, after a solicitation is issued, it determines that a noncompliant proposal represents the best value to the Government. Federal Acquisition Regulation § 15.206, 48 C.F.R. (FAR) § 15.206(d) (1998) (formerly FAR § 15.606, 48 C.F.R. § 15.606), provides:

(a) When, either before or after receipt of proposals, the Government changes its requirements or terms and conditions, the contracting officer shall amend the solicitation.

. . . .

(c) Amendments issued after the established time and date for receipt of proposals shall be issued to all offerors that have not been eliminated from the competition.

(d) If a proposal of interest to the Government involves a departure from the stated requirements, the contracting officer shall amend the solicitation, provided this can be done without revealing to the other offerors the alternate solution proposed or any other information that is entitled to protection . . . .

State declined to avail itself of the procedure outlined in FAR § 15.206, pursuant to which it could have advised all offerors that it had decided to relax the mandatory provisions outlining the four labor categories and the required number of hours allocated to each. Plaintiff is correct that "[t]he other three bidders, Beta, [Cube] and [Rural Electronics] all adhered to the required labor categories and number of hours set forth expressly in the [solicitation] without deviation because [State] denied them the opportunity to do so." Plf's Br. filed May 14, 1999, at 13. If State concluded that an approach more creative or innovative than was permitted by the solicitation's terms represented the best value, State should have afforded all offerors the opportunity to amend their proposals in accordance with its mandate under the FAR. By awarding the contract to HSI based on a facially noncompliant proposal, State imposed a disadvantage upon the other offerors for simply following the solicitation's mandatory terms.[13]

12. The court's April 15, 1999 order opined that the alleged violation singled out by plaintiff, even if resolved in its favor, could not compensate for the point spread between plaintiff's and HSI's score. The administrative record, supplemented by the depositions, disclosed that HSI's creative or innovative management structure was the principal fact or for HSI's rating under each criterion.

13. In support of its motion, plaintiff advanced other arguments: (1) State should have rendered a finding, in accordance with 48 C.F.R. § 9.104 (1998) (To be determined responsible, the contractor must "[h]ave the necessary organization, experience, accounting and operational controls, and technical skills, or the ability to obtain them

. . . ."), that HSI was not a responsible party because HSI's proposal failed to comply with the solicitation's requirement that the offeror demonstrate that they retained the necessary qualified personnel to perform the contract; (2) Mr. Power, motivated by bad faith, failed to conduct a consensus meeting, utilized only negative information against plaintiff obtained from sources outside the administrative record without considering favorable information, and failed to conduct a proper post-award debriefing; and (3) "[P]rocuring officials abused their discretion by claiming that these requirements in the [solicitation] which HSI could not meet were merely hortatory not mandatory, despite the use of words like 'shall' and 'must.'" Plf's Br. filed May 14, 1999, at 8. Review of the administrative

The court remains sensitive to the concerns addressed in ¶ 3 of its April 15, 1999 order. Congress has cautioned: "In exercising jurisdiction under this subsection, the courts shall give due regard to the interests of national defense and national security and the need for expeditious resolution of the action." 28 U.S.C.A. § 1491(b)(3) (West Supp.1998). At the court's April 14, 1999, hearing on plaintiff's motion for temporary and preliminary injunctive relief, Mr. Roberts testified for defendant. Mr. Roberts' chief concern was that, if the court granted plaintiff's request for injunctive relief, the temporary absence of personnel and attendant labor disruption resulting from the change in contractors could compromise the security of U.S. embassies and other State construction projects currently underway. Should an injunction issue, the court shall take under advisement all outstanding issues affecting the interests of national security and national defense.

## CONCLUSION

Defendant's motion for judgment upon the administrative record is denied; plaintiff's cross-motion for summary judgment is grant-

record and deposition transcripts support the following findings: Although the TEP cut corners, the technical review withstands scrutiny under the considerable latitude afforded it to discharge its functions. [ ]

ed insofar as HSI's technical proposal violated a mandatory provision of the solicitation.

Accordingly, based on the foregoing,

**IT IS ORDERED** as follows:

1. The matter is remanded to State to determine if there was a substantial chance that plaintiff would have received the award but for the error.[14]

2. State shall render its decision, with reasons, by June 25, 1999.

3. Should State determine to cancel the solicitation and resolicit, HSI shall remain *in situ* for reasons of national security, consistent with 28 U.S.C.A. § 1491(b)(3), until such time as a new contract is awarded.

4. By June 7, 1999, the parties shall file their request for deletion of protected/privileged material before the court issues its opinion for publication.

14. [ ]