**EP PRODUCTIONS, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 04–1428C.**

United States Court of Federal Claims.

Filed under seal Nov. 30, 2004.

Reissued Jan. 3, 2005 [1].

Robert Abney Fricks, The Fricks Firm, Warner Robins, Georgia, for plaintiff.

Claudia Burke, U.S. Department of Justice, Washington, D.C., with whom was Assistant Attorney General Peter D. Keisler, for defendant.

**OPINION**

ALLEGRA, Judge.

This action involves a post-award protest by EP Productions ("EP" or "plaintiff"), a disappointed offeror for a contract to provide event planning services for an annual training symposium hosted by the United States Army's Surface Deployment and Distribution Command ("SDDC").[2] Pending before the court are the parties' cross-motions for judgment on the administrative record. For the reasons that follow, the court **GRANTS** defendant's cross-motion and **DENIES** plaintiff's motion, thereby concluding that no relief is appropriate herein.

**I. FACTUAL BACKGROUND** [3]

On October 16, 2003, the SDDC issued Solicitation No. DAMT01–03–R–0072 (the "solicitation") for a contract to provide meeting planning and organizational assistance to the SDDC for its annual transportation train-

---

1. An unredacted version of this opinion was issued under seal on November 30, 2004. The opinion issued today incorporates the parties' redactions (plaintiff did not propose any). This redacted material is represented by brackets [ ].

2. At the time the solicitation in question was issued, the SDDC was known as the Military Traffic Management Command.

3. These facts are drawn from the administrative record and the supplements ordered thereto.

ing symposium. Performance was to begin 12 months prior to the symposium, which is to be held during the last week of April 2005.

The solicitation, as amended, provided for a multi-staged award process under which offerors would submit their complete technical proposals by December 22, 2003. In the first phase of this process, the two facilities proposed by each offeror for hosting the conference were to be subject to an initial "acceptability determination." Regarding this determination, the solicitation advised—

> If any facility is not adequate and does not meet the requirements in the [performance work statement], the Offeror will be rejected and no further evaluation will be done. This means that Offerors that fail the acceptability determination for the facility will not be considered for award and their written proposals will not be evaluated.

Offerors meeting this threshold requirement were to "receive full evaluations of all factors," with those offerors "with most highly rated proposals and a reasonable chance of receiving the contract award" to be considered "within the Competitive Range." The latter offerors were to proceed to phase II of the award process, in which they were to make oral presentations using briefing slides. The winning offeror was to be the one within the competitive range "whose proposal conforms to the solicitation requirements and presents the Best Value to the Government." The government reserved the right to award the contract to an offeror not supplying the lowest price or receiving the highest evaluation ratings. The solicitation also stated that the government "intended" to make the contract award based solely on the offerors' initial submissions, that is, without further discussions with the offerors.

Eight companies submitted proposals. The evaluation team concluded that seven of these satisfied the threshold facility acceptability requirement. In early February 2004,

the contracting officer, the source selection authority, determined that three of these seven—including plaintiff, American Small Business Alliance (ASBA), and the eventual winner, A–S–K Associates—were within the competitive range. A fourth offeror, Avail Inc., was later included in this group after a successful appeal. Between March 3 and 9, 2004, the four offerors within the competitive range made their oral presentations to SDDC officials, with each presentation being videotaped. The evaluation team was deadlocked and could not agree to the rating to be assigned to plaintiff's presentation. The Army's Source Selection Guide indicates that the source selection authority is not bound by a panel's rankings. Pursuant to her authority, the contracting officer, who was the source selection authority, reevaluated the oral presentations and gave EP a rating of [ ], because she felt that it had failed to address adequately one of the required factors, involving [ ].[4]

In early April 2004, while preparing to document an award decision, the contracting officer conducted an independent, in-depth review of the evaluation team's findings. She concluded that the evaluation team had failed to identify deficiencies in all eight of the original proposals, and that every offeror remaining in the competitive range had deficiencies that prohibited award on initial offers. On April 5, 2004, the contracting officer e-mailed the four remaining offerors that SDDC would be conducting negotiations to "discuss the weaknesses" in each proposal.[5] In an April 6, 2004, "Memorandum for Record," the contracting officer described her decision to enter into negotiations with the parties and cited at least two indications that a member of the evaluation team was leaking proprietary information to plaintiff. On that basis, and with the "advice and concurrence" of others within SDDC, she decided to con-

---

**4.** Two individuals on the evaluation team had noted this same deficiency, but had rated the presentation [ ]. The other two individuals on the evaluation team rated the presentation [ ]. Nonetheless, the record reveals that the four individuals on the team collectively identified a number of weaknesses in EP's presentation.

**5.** This e-mail continued—"[i]f you are already aware of areas of weakness in your proposal (as a result of questions that you may have been asked at Orals) or if you realize areas where your proposal does not meet the solicitation requirements, please begin to work on alternatives for your revised proposal."

vene an entirely new evaluation team to evaluate the revised proposals.

On May 14, 2004, the contracting officer issued a "Pre Negotiation Objective Memorandum," in which she described the errors that she believed had marred the initial evaluations. In this memorandum, she noted that her prior review had uncovered that seven of the eight original offers—all except plaintiff's—had failed the threshold facility acceptability requirement. In addition, she noted that her prior evaluation had revealed that—

> every Offeror remaining in the competitive range had deficiencies that prohibited award on initial offers, and discussions would be necessary in order to allow the Offerors to revise their proposal to meet the minimum requirements of the solicitation. A decision was made to allow all Offerors in the competitive range to correct every deficiency in their proposal.

Finally, the memorandum indicated that "[a]n amendment will be issued to ... remove the restrictive acceptability determination on the facility and allow all Offerors an opportunity to correct and/or replace facilities as necessary." Amendment No. 3 to the Solicitation, effecting this change, was issued the same day.[6]

Discussions were initiated in writing on May 14, 2004, and followed up telephonically on May 17, 2004. On May 14, 2004, the Contracting Officer sent letters to all four offerors identifying deficiencies and weaknesses in their proposals and inviting them to submit revised proposals rectifying those problems.[7] The letter to plaintiff identified two deficiencies, involving [ ] and the need to provide a[ ] for the government's use at the conference, and one weakness, involving [ ]. It also suggested several items for clarification, including one relating to EP's oral presentation. Telephonic discussions regarding the topics identified in each offeror's respective letters were conducted on May 17, 2004. On or before June 4, 2004, the four offerors within the competitive range were allowed to and did submit their best and final offers (BAFOs). On June 8, 2004, the SDDC executed an amendment to the solicitation that permitted offerors to propose meeting rooms that contained pillars; on June 9, 2004, plaintiff provided a slightly revised proposal to accommodate that amendment.

Meanwhile, on June 8, 2004, the contracting officer replaced the original evaluation team with a new, three-member team. The new team conducted evaluations of the revised proposals from June 8–16, 2004, and completed evaluation summary sheets for all four offerors. On June 24, 2004, the contracting officer signed a Price Negotiation Memorandum reviewing the proposals and recommending that A–S–K Associates be awarded the contract. This memorandum recorded the results of the evaluation as follows:

| Offeror | Mgt. Approach | Overall Technical Capability Rating | Orals | Facilities | Price |
|---|---|---|---|---|---|
| A–S–K | [ ] | [ ] | [ ] | [ ] | [ ] |
| Avail Inc. | [ ] | [ ] | [ ] | [ ] | [ ] |
| EP | [ ] | [ ] | [ ] | [ ] | [ ] |
| ASBA | [ ] | [ ] | [ ] | [ ] | [ ] |

6. This amendment deleted the prior language regarding the acceptability determination, substituting therefor the following permissive language:

> If any facility is not adequate and does not meet the requirements in the [performance work statement], the Offeror may be rejected and no further evaluation will be done.

7. In accordance with the FAR, "deficiency," for this purpose, was defined as a "material failure ... to meet a Government requirement," while a "weakness" was defined as "a flaw ... that appreciably increases the risk of unsuccessful contract performance."

In this memorandum, the contracting officer found that although three of the four offerors had submitted "excellent" proposals, "[o]verall, ASK's technical proposal is significantly superior to Avail's and EP Production's [sic] in a way that is beneficial to the Government."[8] As further support for awarding the contract to A–S–K, the contracting officer concluded—

> ASK offers strengths that will significantly enhance the performance and combined with the lowest price makes ASK's proposal the most advantageous to the Government. When all factors and subfactors are considered equally, ASK's proposal represents the best value to the Government and represents the lowest price.

The contracting officer's resulting decision to award the contract to A–S–K was approved by SDDC's Executive Review Board on June 25, 2004.

Plaintiff was notified of the pending award to A–S–K and, on June 28, 2004, requested a debriefing regarding the decision. On June 30, 2004, plaintiff filed its first protest with the SDDC, arguing, *inter alia*, that plaintiff had been "denied fair consideration [and] was prejudiced by improper breaks in protocol." Plaintiff's protest sought a stay of the existing contract pending investigation and resolution of the protest, award of the contract to plaintiff, and costs. On July 16, 2004, SDDC denied this protest, as untimely. On July 26, 2004, plaintiff filed a second protest, which was denied by the agency on August 5, 2004.

On September 9, 2004, plaintiff filed the instant suit. Subsequently, the parties filed cross-motions for judgment on the administrative record. On October 28, 2004, the court held oral argument on this matter. Following oral argument, the court ordered the parties to file supplemental briefing on the issue of the contracting officer's authority to issue Amendment No. 3 to the Solicitation, which granted the government discretion to accept proposals that would otherwise have failed to satisfy a mandatory minimum requirement. Those supplemental briefs were filed on November 8, 2004.

## II. DISCUSSION

We begin with common ground. In a bid protest case, this court will enjoin the government only where an agency's actions were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A) (2000); *see also* 28 U.S.C. § 1491(b)(4) (2000). By its very definition, this standard recognizes the possibility of a zone of acceptable results in a particular case and requires only that the final decision reached by an agency be the result of a process which "consider[s] the relevant factors" and is "within the bounds of reasoned decisionmaking." *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.,* 462 U.S. 87, 105, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983); *see Software Testing Solutions, Inc. v. United States,* 58 Fed.Cl. 533, 538 (2003); *Gulf Group, Inc. v. United States,* 56 Fed.Cl. 391, 396 (2003). This court will interfere with the government procurement process " 'only in extremely limited circumstances.' " *CACI, Inc.–Federal v. United States,* 719 F.2d 1567, 1581 (Fed.Cir.1983) (quoting *United States v. John C. Grimberg Co., Inc.,* 702 F.2d 1362, 1372 (Fed.Cir.1983)). Indeed, a "protester's burden is particularly great in negotiated procurements because the contracting officer is entrusted with a relatively high degree of discretion, and greater still, where, as here, the procurement is a 'best-value' procurement." *Banknote Corp. of America, Inc. v. United States,* 56 Fed.Cl. 377, 380 (2003), *aff'd,* 365 F.3d 1345 (Fed.Cir. 2004); *see also TRW, Inc. v. Unisys Corp.,* 98 F.3d 1325, 1327–28 (Fed.Cir.1996); *LaBarge Prods., Inc. v. West,* 46 F.3d 1547, 1555 (Fed.Cir.1995) (citing *Burroughs Corp. v. United States,* 223 Ct.Cl. 53, 617 F.2d 590, 597–98 (1980)); *JWK Int'l Corp. v. United States,* 52 Fed.Cl. 650, 655 (2002).

---

8. In this regard, the contracting officer found that A–S–K offered superior strengths including [ ]. Many of these features were not offered by EP. The contracting officer also found that A–S–K's diverse experience outweighed EP's limited experience, even though the latter was the contract incumbent.

 It is the burden of the aggrieved offeror to demonstrate that the challenged agency decision is either irrational or involved a clear violation of applicable statutes and regulations. *Banknote Corp. of America, Inc. v. United States,* 365 F.3d 1345, 1351 (Fed.Cir.2004), *aff'g,* 56 Fed.Cl. 377, 380 (2003).[9] Further, "to prevail in a protest the protester must show not only a significant error in the procurement process, but also that the error prejudiced it." *Data General Corp. v. Johnson,* 78 F.3d 1556, 1562 (Fed. Cir.1996). To demonstrate prejudice, "the protestor must show 'that there was a substantial chance it would have received the contract award but for that error.'" *Alfa Laval Separation, Inc. v. United States,* 175 F.3d 1365, 1367 (Fed.Cir.1999) (quoting *Statistica, Inc. v. Christopher,* 102 F.3d 1577, 1582 (Fed.Cir.1996)). Finally, because injunctive relief is so drastic in nature, a plaintiff must demonstrate that its right to such relief is clear. *See Banknote Corp. of America, Inc.,* 56 Fed.Cl. at 380–81; *Seattle Sec. Servs., Inc.,* 45 Fed. Cl. at 566; *cf. Beta Analytics Int'l, Inc. v. United States,* 44 Fed.Cl. 131, 137 n. 10 (1999).

In the case *sub judice,* the SDDC evaluation team initially determined that seven of the eight proposals received met the solicitation's threshold requirements for the facilities at which the proposed training was to be conducted. Recall, that as originally drafted, the solicitation indicated that any proposal that failed to meet these facility requirements would not be further considered. After the contracting officer determined that four of the qualifying companies were within the competitive range and after those offerors made oral presentations, the contracting officer discovered that only plaintiff's proposal actually met the threshold facility requirements. She also found, however, that the technical portions of all of the offerors' proposals, including plaintiff's, contained deficiencies and weaknesses. Accordingly, rather than declaring plaintiff the only eligible offeror, as having the only proposal meeting the threshold facility requirements, the contracting officer instead concluded that SDDC should continue discussions and allow the four offerors within the competitive range to revise their proposals to remedy their respective deficiencies. Toward this end, the contracting officer concluded that SDDC should amend its solicitation to alter the threshold facility acceptability requirement to permit SDDC the discretion to evaluate even bids that had failed the threshold test.

Attacking the eventual award to A–S–K, plaintiff primarily claims that this amendment was unwarranted and an abuse of discretion. Regarding amendments, FAR § 15.206(a) states that "[w]hen, either before or after the receipt of proposals, the government changes its requirements or terms and conditions, the contracting officer shall amend the solicitation." Numerous cases indicate that this provision may—indeed, must—be invoked where "after a solicitation is issued, [the agency] determines that a noncompliant proposal represents the best value to the Government." *Beta Analytics,* 44 Fed.Cl. at 139; *see also MVM Inc. v. United States,* 46 Fed.Cl. 126, 131–32 (2000); *Candle Corp. v. United States,* 40 Fed.Cl. 658, 663 (1998). Amendments under this provision may also be appropriate "to avoid

---

**9.** In *Banknote,* the Federal Circuit expounded upon these principles, as follows:

Under the APA standard as applied in ... ADRA cases, "a bid award may be set aside if either (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation of procedure." [*Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d 1324, 1332 (Fed.Cir.2001)]. When a challenge is brought on the first ground, the test is "whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a 'heavy burden' of showing that the award decision had no rational basis." *Id.* at 1332–33

(citations omitted). "When a challenge is brought on the second ground, the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations." *Id.* at 1333. To establish prejudice under this second ground, a protester must show that there was a "substantial chance" it would have received the contract award absent the alleged error. *Emery Worldwide Airlines, Inc. v. United States,* 264 F.3d 1071, 1086 (Fed.Cir.2001); *Alfa Laval Separation, Inc. v. United States,* 175 F.3d 1365, 1367 (Fed.Cir.1999).

*Banknote Corp.,* 365 F.3d at 1351; *see also Seattle Sec. Servs., Inc. v. United States,* 45 Fed.Cl. 560, 566 (2000); *Analytical & Research Tech., Inc. v. United States,* 39 Fed.Cl. 34, 42 (1997).

award decisions not based on the agency's most current view of its needs." *NV Servs.*, B–284119.2, 2000 CPD ¶ 64, at 12, 2000 WL 350269 (Comp.Gen.2000); *see also ManTech Telecomm. & Info. Sys. Corp. v. United States*, 49 Fed.Cl. 57, 74–75 (2001). Indeed, most cases in which agencies have run afoul of this FAR provision involve situations in which evaluation requirements were changed without the requisite formal amendment. *See Gentex Corp. v. United States*, 58 Fed.Cl. 634, 653 (2003); *Beta Analytics*, 44 Fed.Cl. at 139.

■ Although this case is somewhat different, it, nonetheless, is controlled by the principles established in these amendment decisions. Plaintiff understandably is frustrated that the amendment here allowed others to remain in the competition, ultimately leading to another firm being selected for the award. But, the types of concerns it raises are subsumed and fully addressed in the context of the standard the courts have employed in reviewing proposed amendments under section 15.206(a), *to wit*, whether the action is taken "in good faith, without the specific intent of changing a particular offeror's technical ranking or avoiding an award to a particular offeror." *Federal Sec. Sys., Inc.*, B–281745.2, 99–1 C.P.D. ¶ 86, at 5, 1999 WL 292729 (Comp.Gen.1999). In *ManTech*, for example, this court faced a protester's claim that allowing the Army to revise the technical requirements of the solicitation would unfairly allow a competitor to submit a revised proposal curing deficiencies in its original submission. Applying the aforementioned "good faith" standard, this court upheld the amendment, reasoning—

> At the core of this standard are essentially the same types of fairness concerns that [the protester] raises, in particular, the concern that an amendment not be used as a vehicle to steer a contract toward or away from a particular contractor. These fairness concerns are neither implicated

nor offended to the extent such an amendment is designed, instead, merely to ensure that the United States receives the best possible value at the lowest cost— indeed, such is the essence of a best value procurement.

*ManTech*, 49 Fed. Cl. at 75; *see also ViroMed Labs., Inc. v. United States*, 62 Fed. Cl. 206, 218 (2004). It observed that the result reached comported with decisions holding that where, in a negotiated procurement, an offeror's proposal does not comply with the solicitation's requirements, " 'an agency is not required to eliminate the awardee from the competition, but may permit it to correct its proposal.' " *ManTech*, 49 Fed. Cl. at 71 (quoting *D & M Gen. Contracting, Inc*, B–252282, B–252282.4, 1993 WL 325094, at \*2 (Comp.Gen. Aug.19, 1993); *see also SMS Data Prods. Group, Inc. v. Austin*, 940 F.2d 1514, 1517 (Fed.Cir.1991)).

■ The various principles governing amendments are essentially corollaries of a basic rule designed to promote fair competition, particularly in the context of negotiated, best value procurements. Indeed, while FAR section 15.206 specifies situations in which an agency must amend a solicitation, it does not purport to cabin an agency's discretion to amend a solicitation to ensure full competition and thus "to permit the government to obtain its minimum requirements at the most favorable price." *ManTech*, 49 Fed.Cl. at 73; *see also Bethlehem Steel Corp.*, B–231923, B–231923.2, 88–2 CPD ¶ 438, at 6, 1988 WL 228164 (Comp.Gen. 1988).[10] By comparison, the rigid rule that plaintiff espouses here would leave the government at the mercy of a single contractor—even one that has deficiencies in its proposal—if, as the result of the application of certain mandatory requirements, every other competitor in a negotiated, best value procurement were initially disqualified. That result is illogical and finds no support in the law.[11] To so hold would be to run counter to

---

10. Consistent with the view that an agency may amend its solicitation to promote competition, FAR § 15.206(d) also states that "[i]f a proposal of interest to the Government involves a departure from stated requirements, the contracting officer shall amend the solicitation."

11. In support of its claim, plaintiff cites *Integrated Sys. Group*, 95–2 B.C.A. ¶ 27,241, 1995 WL 340689. There, a protest of an award was sustained when it was determined that the awardee's products failed to meet mandatory requirements. With two technically acceptable best and final proposals before it, the agency did not

all the cases in which amendments or other corrections designed to promote competition, after the receipt of proposals, have been allowed. Moreover, contrary to plaintiff's unsupported claims, there is not the slightest hint that, in amending the solicitation to relax the threshold facility requirements, the contracting officer was acting in "bad faith," actuated by *animus* and with a specific intent to harm plaintiff.[12] Rather, every indication is that the purpose of the amendment was not to prevent plaintiff from receiving the award, but rather to promote competition, with the obvious benefits it would afford to the government, particularly as identified deficiencies were resolved in discussions and revised best and final proposals. The amendment, therefore, was not arbitrary, capricious or otherwise contrary to law.

Plaintiff next asseverates that the contracting officer acted arbitrarily in assigning its oral presentation a score lower than it had received from any of the individual evaluation team members. Plaintiff, however, never comes to grips with the crucial fact that the evaluation team's ratings were not determinative and that the contracting officer was responsible for assigning a final rating, particularly where, as here, the evaluators could not agree. Plaintiff has not demonstrated that the contracting officer's findings are unsupported by the administrative record or inconsistent with the evaluation criteria—indeed, the record reflects that at least two of the evaluators identified the same point that led the contracting officer to assign plaintiff's presentation a rating of only [ ]. Plaintiff offers little more than mere disagreements with the contracting officer's assessment of the adequacy of its oral presentation. "Such naked claims," this court has stated, "by all appearances unsupported by anything in the record, fall far short of meeting the heavy burden of demonstrating that these findings were the product of an irrational process and hence arbitrary and capricious." *JWK Int'l Corp. v. United States,* 52 Fed.Cl. at 660; *see also Banknote Corp.,* 56 Fed. Cl. at 384; *Carlson Wagonlit Travel,* 2001 C.P.D. ¶ 49 at 3 (2001) ("an offeror's mere disagreement with the agency's judgment concerning the adequacy of the proposal is not sufficient to establish that the agency acted unreasonably"); *PEMCO World Air Servs.,* 2000 C.P.D. ¶ 71 at 15 (2000) (same).

Finally, plaintiff argues that the SDDC violated the FAR in failing to discuss, as part of its negotiations, its concerns with plaintiff's financial ability to handle the [ ]. As the parties agree, agencies generally are required to conduct "meaningful" discussion with all responsible offerors which submit proposals within the competitive range. *See* 48 C.F.R. § 15.306(d); *see also Dynacs Eng'g Co. Inc. v. United States,* 48 Fed.Cl. 124, 131 (2000) (stating that "the law is well-settled that discussions between a contracting officer and offerors must be meaning-

---

award the contract, but instead issued an amendment requesting second BAFOs from the four original offerors. The Board determined that the technical portion of the BAFO of one of the contractors, Government Technology Services, Inc. (GTSI), was clearly superior to that of the other remaining contractor, and set aside the amendment, ultimately awarding the contract outright to GTSI. In so ruling, the Board relied upon FAR § 15.611(c), which severely limits the ability of agencies to make second or subsequent requests for BAFOs. This case is quite different. There were not two technically acceptable proposals, let alone one superior proposal—rather, every proposal was technically deficient. And, while the amendment here came relatively late in the process, it did not occur after the first round of best and final offers so as to trigger the limitations of section 15.611.

**12.** It is well settled that government officials are presumed to act conscientiously and in good faith in the discharge of their duties. *See, e.g.,* *Spezzaferro v. Federal Aviation Admin.,* 807 F.2d 169, 173 (Fed.Cir.1986); *Asco–Falcon II Shipping Co. v. United States,* 32 Fed.Cl. 595, 604 (1994); *Kalvar Corp. v. United States,* 211 Ct.Cl. 192, 543 F.2d 1298, 1301–02 (1976). In order to overcome this presumption, plaintiff "must allege and prove, by clear and strong evidence, specific acts of bad faith on the part of the government." *Asco–Falcon,* 32 Fed.Cl. at 604. The level of proof to overcome this presumption is high, often described as requiring "well nigh irrefragable proof." *Kalvar,* 543 F.2d at 1301–02. While this standard is not intended to "insulate government action from any review by courts," *Libertatia Assoc., Inc. v. United States,* 46 Fed. Cl. 702, 707 (2000), according to the Federal Circuit, it has "been equated with evidence of some specific intent to injure the plaintiff." *Kalvar,* 543 F.2d at 1302; *see also Librach v. United States,* 147 Ct.Cl. 605, 614, 1959 WL 7633 (1959); *ManTech,* 49 Fed.Cl. at 74 n. 26.

 

ful"). However, the FAR further emphasizes that "the contracting officer is not required to discuss every area where the proposal could be improved" and that "[t]he scope and extent of discussions are matters of contracting officer judgment." 48 C.F.R. § 15.306(d)(3). The effect of these provisions, as this court observed in *Cube Corp. v. United States,* is that "[t]he government 'need not discuss every aspect of the proposal that receives less than the maximum score or identify relative weaknesses in a proposal that is technically acceptable but presents a less desirable approach than others.'" *Cube Corp.,* 46 Fed.Cl. 368, 384 (2000) (quoting *ACRA, Inc. v. United States,* 44 Fed.Cl. 288, 295–96 (1999)); *see also Dynacs,* 48 Fed.Cl. at 131. As such, SDDC was not required to discuss plaintiff's financial ability because the agency had determined that plaintiff's presentation on this point was acceptable, albeit entitled only to a[ ] rating. *See Dynacs,* 48 Fed.Cl. at 131–32; *Cube Corp.* 46 Fed.Cl. at 383–84. Accordingly, plaintiff's argument on this last issue also fails.[13]

### III. CONCLUSION

In the interests of rendering a prompt decision, this court need go no further. Measured by the appropriate standard of review, the SDDC's conduct here was not erroneous. The injunctive relief requested by plaintiff, therefore, is not appropriately granted.

In consideration of the above, **IT IS ORDERED:**

1. Plaintiff's motion for judgment on the administrative record is **DENIED** and defendant's cross motion for judgment on the administrative record is **GRANTED.**

2. This opinion shall be published as issued after December 30, 2004, unless the parties identify protected and/or privileged materials subject to redaction prior to said date. Said materials shall be identified with specificity, both

in terms of the language to be redacted and the reasons for that redaction.

finisher not only had the highest adjectival ratings of all the competitors, but also the second lowest price (approximately $240,000 lower than plaintiff). Based on the foregoing analysis, however, the court need not reach the issue of prejudice.

---

13. Plaintiff makes several other minor assertions of error, none of which the court finds persuasive. The court further notes that serious questions exist as to whether plaintiff was prejudiced by any of the errors it asserts. The record reflects that plaintiff came in a somewhat distant third in the evaluation, and that the second place