STATISTICA, INC., Appellant,

v.

Warren G. CHRISTOPHER, Secretary of State, Appellee,

and

The Orkand Corporation, Intervenor.

No. 96–1148.

United States Court of Appeals, Federal Circuit.

Dec. 19, 1996.

Timothy Sullivan, Adduci, Mastriani & Schaumberg, L.L.P., of Washington, D.C., argued for appellant. With him on the brief were Katherine S. Nucci and Martin R. Fischer.

Franklin E. White, Jr., Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, D.C., argued for appellee. With him on the brief were Frank W. Hunger, Assistant Attorney General, David M. Cohen, Director, and Joseph A. Kijewski, Assistant Director.

Devon E. Hewitt, Shaw Pittman Potts & Trowbridge, of McLean, Virginia, argued for intervenor. With her on the brief was Alex D. Tomaszczuk.

Before MAYER, PLAGER, and LOURIE, Circuit Judges.

MAYER, Circuit Judge.

Statistica, Inc. appeals the decision of the General Services Administration Board of Contract Appeals in *Statistica, Inc. v. Department of State*, GSBCA No. 13426–P, 96–1 BCA ¶ 28,141, 1996 WL 38727 (1995), denying its protest challenging the Department of State's award to The Orkand Corporation of a contract for technical services to support the modernization of automated consular services systems. Because Statistica has not established any error in the board's decision, we affirm.

*Background*

On January 20, 1995, the Department of State ("State Department" or "agency") issued Request for Proposals S–OPRAQ–95–

R–0501 ("RFP" or "solicitation") for technical services to support the modernization of key automated consular services systems operated by the Bureau of Consular Affairs. The procurement focused primarily on installation and maintenance of, and training for, the consular automated systems at embassies and consulates abroad. The RFP contemplated the award of an indefinite delivery/indefinite quantity, time-and-materials contract for a base year and four option years. The technical merit of proposals was more important than price, and the award was to go to the "responsible Offeror whose offer, conforming to the requirements of the solicitation, is evaluated as being the most advantageous to the Government." However, to the extent the agency considered offers to be technically equal, price was to become the "determining factor" for awarding the contract.

The solicitation set forth ten contract line item numbers (CLINs) for ten personnel positions or categories. It contained an estimated number of hours for each CLIN and required offerors to propose an hourly rate for each. The RFP contained four additional CLINs not here relevant. Among the many Federal Acquisition Regulation (FAR) clauses incorporated by reference in the solicitation was the provision entitled "Service Contract Act of 1965, as Amended," 48 C.F.R. § 52.222–41. However, the RFP did not contain or reference the FAR provision found at 48 C.F.R. § 52.222–46, entitled "Evaluation of Compensation for Professional Employees." That clause is required to be inserted in RFPs for contracts expected to exceed $500,000 when the service to be provided "will require meaningful numbers of professional employees." 48 C.F.R. § 22.1103. Because the contracting officer had decided that the contract would not involve meaningful numbers of professional employees, he did not include the clause. Finally, Section J of the RFP contained the Wage Determination issued by the Department of Labor, which established minimum hourly wage rates and fringe benefits for this service contract.

Four firms submitted offers in response to the RFP. The agency evaluated the four initial proposals but included only Statistica and Orkand in the competitive range, thereby eliminating the other two firms from further negotiations. In reviewing their respective cost proposals, the contracting officer became concerned with the base labor rates offered by each firm. Some of the rates were less than the wages specified in the Wage Determination for the personnel category the contracting officer thought corresponded to the pertinent CLIN. He was concerned further with the disparate mark-up of these rates for overhead.

In an effort to allay these concerns, the contracting officer issued Amendment Three to the solicitation, which added clause "H.14 Correlation of Contract Positions," listing the ten contract labor categories and the Wage Determination classification he thought corresponded to each category. That provision also reflected the contracting officer's opinion that two of the positions were exempt. Amendment Three also replaced the original Wage Determination with a new one, which contained a footnote stating that the classifications do "not apply to employees employed in a bona fide executive, administrative, or professional category as defined and delineated in 29 CFR 541 (See 29 CFR 4.156)." The contracting officer also sent Orkand and Statistica substantively identical deficiency reports explaining that the Service Contract Act requires that employees in nonexempt labor categories (categories that are not bona fide executive, administrative, or professional) be reimbursed at or above the rate contained in the Wage Determination. Because significant percentages of Statistica's and Orkand's proposed labor rates were below the rates in the Wage Determination, each firm was directed to confirm its compliance with the Service Contract Act and to identify any categories it had determined were exempt from the Act.

Both firms confirmed their compliance with the Service Contract Act and the Wage Determination. Statistica believed that some of the eight positions not identified as exempt were, in fact, exempt, including the "Documentation Specialist" position. Orkand also thought that some of these positions were exempt, but not "Documentation Specialist." The contracting officer deemed

these responses to be reasonable, so he requested best and final offers (BAFOs) from the two firms. The request was attached to Amendment Four, which revised clause H.14 to substitute "Technical Writer" for "Document Preparation Clerk" as the Wage Determination position that corresponded to "Documentation Specialist." The request also asked Statistica and Orkand each to "provide [its] best and final pricing proposal based on this revised Section H."

Statistica interpreted this instruction and Amendment Four as a rejection of its position on the exemption of the CLIN positions from the requirements of the Service Contract Act. The cost proposal manager testified that Statistica "did not understand what the Government was doing" but felt that the agency had directed it to use at least the Wage Determination figures in pricing its offer. Orkand, in contrast, did not interpret Amendment Four as mandating that offerors price their proposals using the figures in H.14. Rather, it based its BAFO prices not on H.14 but on its position that a specified number of the ten CLIN positions were exempt.

Neither the contracting officer nor any other agency personnel informed Statistica or Orkand whether the agency accepted their exemption arguments or deemed them reasonable. Nor did either firm ask whether its exemption arguments had been accepted by the agency. Indeed, the contracting officer testified that he never intended to reach agreement with the offerors as to which categories were properly exempt, for it was not his decision to make.

Statistica had the higher-priced, technically-superior proposal. More specifically, its price was $7,256,689, or 37%, higher than Orkand's, while its technical score was just 15% higher. The contract specialist drafted a source selection memorandum, in which he concluded that Orkand's offer met the government's needs and that the additional technical merit of Statistica's proposal did not warrant paying the significantly higher price. Thus, he recommended that the agency award the contract to Orkand. The Source Selection Advisory Council (SSAC) members concurred with his conclusion and recommended to the Source Selection Authority (SSA) that the award be made to Orkand. The SSA accepted the SSAC's recommendation and Orkand was awarded the contract on September 22, 1995.

On September 29, 1995, Statistica protested the award to the General Services Administration Board of Contract Appeals (GSBCA). As amended, Statistica's protest contained three counts pertinent to this appeal: (1) Orkand's proposal was technically unacceptable for failing to comply with the mandatory requirement that offerors bid using the correlation matrix in clause H.14 (Count III); (2) the agency conducted misleading discussions with it regarding the mandatory nature of clause H.14 (Count IV); and (3) the agency conducted an unreasonable price analysis of the proposals and erred by failing to include FAR § 52.222–46 in the RFP (Count II). The board denied the protest, holding that the State Department had committed no error. The board also stated that even had Statistica prevailed on Count II, any error would have been harmless based on the SSA's "thoughtful," "well-reasoned," and "convincing testimony" that Statistica's technical superiority would not have justified awarding it the contract even if the price difference had been as small as $4 million. That is the difference Statistica's expert testified would have existed had Statistica priced its offer using base wage rates below those in the Wage Determination and contractor-site overhead instead of home-site overhead. Statistica appeals.

*Discussion*

This case, one of the last vestiges of the now-repealed Brooks Automatic Data Processing Act, 40 U.S.C. § 759, *see Grumman Data Sys. Corp. v. Dalton,* 88 F.3d 990, 995 n. 2 (Fed.Cir.1996), presents us with an opportunity to restate the law on the competitive prejudice required to be proven in bid protests. This is a matter of continuing vitality in other forums, beyond the particularity of the Brooks Act. So it is worthy of more than passing consideration notwithstanding the loss of the board's protest authority.

We review protest decisions of the GSBCA under the standard set forth in the Contract Disputes Act of 1978. 40 U.S.C. § 759(f)(6)(A) (1994). That standard mandates that we affirm the board's decision on any fact question unless its findings are "fraudulent, or arbitrary, or capricious, or so grossly erroneous as to necessarily imply bad faith, or ... not supported by substantial evidence." 41 U.S.C. § 609(b) (1994); *Grumman Data*, 88 F.3d at 995. Substantial evidence means " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Grumman Data*, 88 F.3d at 995 (quoting *Frank v. Department of Transp.*, 35 F.3d 1554, 1556 (Fed.Cir.1994)). However, we review questions of law de novo. 41 U.S.C. § 609(b); *Grumman Data*, 88 F.3d at 995.

Statistica argues that the board erred in concluding (1) that Orkand's proposal complied with the requirements of the RFP, namely the H.14 clause (Count III); (2) that the State Department's discussions of the offeror's base labor rates were proper (Count IV); (3) that the contracting officer did not abuse his discretion by failing to include the FAR's Professional Employee Compensation Clause in the RFP (Count II); and (4) that the State Department's cost evaluation was proper (also Count II). The government and Orkand urge us to affirm the board's decision on the sole basis that even assuming the existence of the alleged procurement errors, Statistica did not establish that it was harmed or prejudiced by the errors.

A protester must show not simply a significant error in the procurement process, but also that the error was prejudicial, if it is to prevail in a bid protest. *See Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir.1996) (citing cases). To establish competitive prejudice, a protester must demonstrate that but for the alleged error, there was a " '*substantial chance* that [it] would receive an award—that it was within the zone of active consideration.' " *CACI, Inc.-Fed. v. United States*, 719 F.2d 1567, 1574–75 (Fed.Cir.1983) (quoting *Morgan Bus. Assocs., Inc. v. United States*, 223 Ct.Cl. 325, 619 F.2d 892, 896 (1980)) (emphasis added).

In *Data General*, this court said that "the appropriate standard is that, to establish prejudice, a protester must show that, had it not been for the alleged error in the procurement process, there was a *reasonable likelihood* that the protester would have been awarded the contract." 78 F.3d at 1562 (emphasis added). The court reexamined the appropriate prejudice standard in an effort to unify what it perceived to be "variations in the verbal formulation of what is necessary to show prejudice." *Id.*

The "variations" it cited were from the Claims Court and the GSBCA. However, those tribunals are required to follow the "substantial chance" standard, as indeed, they have. *See, e.g., TRW, Inc. v. United States*, 28 Fed. Cl. 155, 161 (1993); *Compliance Corp. v. United States*, 22 Cl.Ct. 193, 199 (1990); *cf. Computer Mktg. Corp.*, GSBCA No. 8276–C, 87–1 BCA ¶ 19,405 at 98,118, 1986 WL 20765 (1986). The court also thought that the General Accounting Office's (GAO) prejudice formulation was at odds with the "substantial chance" standard. But less than one month before *Data General*, the GAO explained that it "will not sustain a protest unless the protester demonstrates a reasonable possibility that it was prejudiced by the agency's actions, that is, unless the protester demonstrates that, but for the agency's actions, it would have had a substantial chance of receiving the award." *McDonald–Bradley*, B–270126, 96–1 CPD ¶ 54 (citing *Marwais Steel Co.*, B–254242.2; B–254242.3, 94–1 CPD ¶ 291). Thus, GAO's standard is in harmony with the "substantial chance" standard set out in *Morgan Business* and *CACI*. *See also Unified Indus. Inc.*, B–212996.2, 84–2 CPD ¶ 139 (citing *Morgan Business* ); *University Research Corp.*, B–186311.2, 81–2 CPD ¶ 428 (same). Even if it were not, however, GAO decisions do not bind us, nor ours them. *Cf. Honeywell, Inc. v. United States*, 870 F.2d 644, 649 (Fed.Cir. 1989).

The *Data General* court stated that the "reasonable likelihood" standard was simply a "refinement and clarification" of the *Morgan Business* and *CACI* decisions. 78 F.3d at 1563. We are confident that that is all that was intended, because it, as we, would

be powerless to overrule those cases absent en banc consideration. *See McAbee Constr., Inc. v. United States,* 97 F.3d 1431, 1434 (Fed.Cir.1996); *Newell Cos. v. Kenney Mfg. Co.,* 864 F.2d 757, 765 (Fed.Cir.1988). Notwithstanding, counsel, as well as some commentators, have interpreted *Data General* as imposing a "reasonable likelihood" standard on protesters that is more burdensome and stringent than the "substantial chance" test of *Morgan Business* and *CACI.* In fact, the government stated at argument that it believes a "reasonable likelihood" is more onerous to prove than a "substantial chance." *See also* 38 *The Government Contractor* ¶ 147 (Mar. 27, 1996) (*Data General* "appears to substantially increase the protester's burden"); *cf. Global Assocs. Ltd.,* B–271693.2, 96–2 CPD ¶ 100 at 6 (GAO rejected an agency's invitation to apply *Data General*). While it is true that a "likelihood" connotes a higher probability than a "chance," the adjectives "reasonable" and "substantial" modifying those respective nouns appear to us to bring the two standards close to synonymity. Rather than engage in verbal gymnastics, however, suffice it to say that *Data General* did not, as it could not, replace the "substantial chance" standard with a more demanding one. *Morgan Business* and *CACI* remain controlling. Thus, for Statistica to prevail it must establish not only some significant error in the procurement process, but also that there was a substantial chance it would have received the contract award but for that error.

■ Statistica first argues that Orkand failed to comply with the allegedly mandatory requirement of the RFP that offerors price their proposals in accordance with the H.14 correlation matrix, thereby rendering its proposal unacceptable. But for the State Department's improper waiver of this requirement it would have received the contract as the only other offeror in the competitive range. We disagree.

The government did not intend that H.14 be mandatory, nor did Orkand interpret it that way. Statistica points to no provision in the RFP that expressly mandates the use of the pricing matrix or explicitly rejects the parties' respective exemption arguments.

But even assuming the reasonableness of Statistica's interpretation that it was mandatory, Orkand's contrary interpretation was at least equally reasonable. Statistica's own cost proposal manager testified that it is the contractor's responsibility, not the agency's, to determine whether particular employees are covered by the Service Contract Act. 96–1 BCA at 140,483. Consequently, the solicitation was at most ambiguous. *Grumman Data,* 88 F.3d at 997 ("If more than one meaning is reasonably consistent with the contract language, then the contract term is ambiguous."). And any ambiguity was patent: after the issuance of Amendment Four, Statistica's cost proposal manager "didn't understand what the Government was doing." Moreover, its interpretation that the State Department had rejected its position about the exemption of the additional personnel categories from the Service Contract Act conflicted with its understanding that the contractor, not the agency, determines whether an exemption applies. Thus, Statistica had a duty to seek clarification from the government, and its failure to do so precludes acceptance of its interpretation.

For the same reason, we reject Statistica's argument that the government engaged in improper and misleading discussions about whether clause H.14 was mandatory. Even if we were to assume that the State Department's discussions were misleading, Statistica had a duty to seek clarification. It argues that it could not because discussions had closed, and that any further communications with the State Department would have necessitated the issuance of an RFP amendment, which would have delayed the procurement. This concern is misplaced.

While the FAR prohibits agencies from reopening discussions after the receipt of BAFOs unless it is clearly in the government's interest to do so, 48 C.F.R. § 15.611(c), Statistica points to no provision precluding an offeror from seeking clarification of a patently ambiguous solicitation after an agency has requested BAFOs but prior to their receipt. Indeed, the GSBCA's bid protest rules mandate that in a negotiated procurement, alleged solicitation improprieties, including ambiguities, absent from the initial

RFP but subsequently incorporated in it, must be protested no later than the next closing time for receipt of proposals following the incorporation. *Id.* § 6101.5(b)(3)(i); *Grumman Data,* 88 F.3d at 998. Otherwise, the right to contest the agency's reasonable interpretation is lost. 88 F.3d at 998. Statistica also has not established that any delay resulting from a clarification request would have prejudiced it or would have been impractical.

■■■ Finally, again assuming the board erred in holding that the State Department's cost evaluation was proper and that the contracting officer did not abuse his discretion by failing to include the FAR's Professional Employee Compensation Clause in the RFP, Statistica has not demonstrated that the errors were prejudicial. Its expert testified that the difference between the two BAFO prices would have been only $4 million had Statistica priced its offer using base wage rates below those in the Wage Determination and contractor-site overhead instead of home-site overhead. The SSA testified, however, that that price difference would not have changed his award decision because Statistica's technical advantage was slight. The board found the SSA's testimony credible, calling it "thoughtful," "well-reasoned," and "convincing." 96–1 BCA at 140,493. Of course, credibility determinations are "virtually unreviewable." *See Hambsch v. Department of Treasury,* 796 F.2d 430, 436 (Fed. Cir.1986).

In support of its argument that it was prejudiced by these assumed errors, Statistica points to testimony from one of the four SSAC members that he would have "argued much stronger for Statistica" had the price difference been just 25% instead of 37%. It also points out that the SSA agreed that the SSAC recommendation, and consequently his decision, might have been different had the price gap been smaller than it was. While this testimony raises the chance that Statistica might have received the award, the chance was not substantial. Statistica has cited no record evidence that the contract specialist, who drafted the source selection award recommendation memorandum, would have changed his recommendation, nor that the other three members of the SSAC were inclined to change their recommendation to the SSA. As seen, even that small price differential would not have changed the award.

### Conclusion

Accordingly, the decision of the General Services Administration Board of Contract Appeals is affirmed.

*AFFIRMED.*