**DYNACS ENGINEERING COMPANY, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant,**

and

**Federal Data Corporation, Defendant–Intervenor.**

**No. 00–166 C.**

United States Court of Federal Claims.

Oct. 25, 2000.[1]

1. This opinion and order was issued under seal on September 29, 2000. Pursuant to ¶2 of the ordering language in the September 29, 2000 opinion and order and by separate order of the court, dated October 13, 2000 (amending the September 29, 2000 opinion and order by adding a new footnote 13), the parties were instructed to identify protected/privileged material subject to deletion. Only plaintiff and intervenor proposed redactions. Brackets identify where material has been deleted.

James S. Ganther, Tampa, FL, for plaintiff, Kathleen M. Wade, Tampa, FL, of counsel.

Michael D. Austin, with whom were David W. Ogden, Acting Assistant Attorney General, David M. Cohen, Director, Robert E. Kirschman, Jr., Assistant Director, Department of Justice, Washington, DC, for defendant, Bernard J. Roan and Kaprice Harris, National Aeronautics and Space Administration, of counsel.

Michael A. Hordell, Washington, DC, for defendant-intervenor, Laura Hoffman, Washington, DC, of counsel.

## OPINION AND ORDER

HEWITT, Judge.

This post-award bid protest action comes before the court on cross motions for judgment on the administrative record. Plaintiff, Dynacs Engineering Company, Inc. (Dynacs), protests the decision of defendant, National Aeronautics and Space Administration (NASA or agency or government), to award a contract to Federal Data Corporation (FDC or successful offeror) for Microgravity Research, Development and Operations ser-

vices. FDC is an intervenor in the proceeding.

In its Complaint, filed with this court on March 31, 2000, Dynacs challenges the contract award on the ground that NASA unfairly favored the successful offeror; that the agency failed to document its significant procurement decisions; that the agency did not properly consider the negative past performance of the successful offeror; and that the agency followed an arbitrary decision by the General Accounting Office (GAO). In its reply briefing and during oral argument, however, plaintiff limited its challenge to the contract award, asserting, as the determinative issue in the protest, that in contravention of the Federal Acquisition Regulations (FAR), NASA had unfairly favored the successful offeror during the procurement. *See* Plaintiff's Reply Memorandum in Support of Its Motion for Judgment on the Administrative Record (Pl.'s Reply) at 1–2; Transcript of Oral Argument on June 29, 2000(Tr.) at 5–9. For the following reasons, the court sustains the protest.

I. Background

On December 18, 1998, NASA issued Request For Proposal No. RFP3–094978 (RFP) in connection with its Microgravity Research, Development and Operations Contract (MRDOC). Administrative Record (AR) at 1214. The RFP sought proposals for microgravity flight hardware development and operations at NASA's John H. Glenn Research Center at Lewis Field, Cleveland, Ohio. AR at 1177. The contract was for a five-year term with three one-year options. AR at 1217. The MRDOC requires a three-part effort: (1) development of the International Space Station (ISS) Fluids and Combustion Facility (FCF); (2) operations support for the ISS, including planning, integration, flight execution, training, and sustaining engineering; and (3) development of the Principal Investigator Specific Hardware. AR at 1020–21.

A. Basis for Award

The RFP stated, "The Government will follow the procedures as outlined in Title 48, Code of Federal Regulations, FAR 15.3, entitled 'Source Selection' and the NASA FAR Supplement (NFS) 1815.3." AR at 1217. The RFP further stated that contract selection would be based upon technical evaluation and numerical scoring of submitted proposals in accordance with section M of the RFP. AR at 1217. The objective of source selection was "to select the proposal(s) that represent the best value." AR at 1423. The RFP provided that in making the source selection, the Government "will utilize a tradeoff process as described in FAR 15.101–1." AR at 1423.

Section M of the RFP outlined the Evaluation Factors for the award. AR at 1423–33. The three evaluation criteria for the contract were: (1) Mission Suitability; (2) Past Performance; and (3) Cost/Price. *Id.* "The RFP provided that all three factors were of essentially equal importance." AR at 1424.

Mission Suitability was evaluated on four subfactors of differing point-weight totaling 1000 points: (1) Understanding the Requirements (400 points); (2) Management Plan (350 points); (3) Key Personnel (100 points); and (4) Corporate Resources (150 points). AR at 1424–30. Each subfactor "was evaluated by assessing the strengths and weaknesses of each proposal, and assigning an overall numerical score and adjectival rating." AR at 6280. Once determined, the Mission Suitability scores were adjusted based on the degree of cost realism. AR at 1431. Section M.6 of the RFP defined the scale for point adjustment in Mission Suitability scores based upon the percentage difference between the proposed and the probable costs.[2] AR at 1431.

The Past Performance factor of each proposal was evaluated on three considerations: (1) Technical Performance; (2) Schedule Performance; and (3) Cost Performance. AR at 1431–33. The RFP provided that "demon-

---

2. The RFP defined the scale as follows:

| Percentage Difference | Point Adjustment |
| --- | --- |
| +/− 5% | 0 |
| +/− 6 to 10% | 0 |
| +/− 11 to 15% | −10 |
| +/− 16 to 20% | −15 |
| +/− 21 to 30% | −20 |
| +/− More than 30% | −25 |

AR at 1431.

strated accomplishment of work of similar magnitude, scope and complexity to the work required by th[e] procurement [would] be considered." AR at 1432.

Additionally, each proposal was qualitatively evaluated (not numerically scored) on the factor of Cost/Price. AR at 1430. The offerors' proposed costs for the Cost–Reimbursement Delivery Orders were reviewed to determine whether the costs were realistic for the work to be performed. AR at 1430. Moreover, a cost realism analysis and price analysis were conducted to determine the reasonableness of the offers as to the Fixed Price Incentive Firm portions of the contract. AR at 1430.

### B. The Source Selection Process

NASA appointed a Source Evaluation Board (SEB) to evaluate the proposals submitted in response to the RFP. AR at 1001–04. On February 22, 1999, the SEB received four timely proposals. *See* Complaint (Compl.) ¶ 14; AR at 6279. Upon reviewing the proposals, the SEB rated the Mission Suitability factor, assigning a "Very Good" rating to two of the offerors and a "Good" and a "Fair" rating respectively to the other two offerors. AR at 4013. On June 1, 1999, the SEB determined that the two offerors receiving "Very Good" ratings for the Mission Suitability factor, namely Dynacs and FDC, comprised the competitive range. Compl. ¶ 15; AR at 4029–32.

### 1. Initial Evaluation of the Offers [3]

After initial evaluation of the submitted proposals, the SEB assigned a score of [ ] to Dynacs's proposal and a score of [ ] to FDC's proposal for Mission Suitability. AR at 4032. The SEB gave Past Performance ratings of [ ] to Dynacs and [ ] to FDC. AR at 4032. The price of Dynacs's proposal was [ ], and the price of FDC's proposal was [ ].[4] AR at 4032. The SEB prepared written findings enumerating the strengths and weaknesses of the submitted proposals as part of the initial evaluation. AR at 3377–91, 3392–3404.

### 2. SEB's Communication with Offerors Regarding Identified Weaknesses and Outstanding Questions

By facsimile transmission on June 11, 1999, the Contracting Officer (CO), Kurt R. Brocone, advised Dynacs and FDC, as the offerors in the competitive range, that: (1) visits to the offerors' sites would be scheduled; (2) discussions would be held; and (3) final proposed revisions to the offerors' proposals would be due on July 6, 1999. AR at 4033–35, 4061–62. Subsequently, by letter dated June 16, 1999, the SEB informed Dynacs of the weaknesses identified in its proposal and posed related questions. AR at 4037–56. By letter of the same date, the SEB informed FDC of the weaknesses identified in its proposal and posed related questions. AR at 4064–83.

On July 6, 1999, the offerors responded to the identified weaknesses and questions from the SEB. AR at 4088–4196, 4197–4432. The SEB reviewed the submissions, specifically noting whether the offerors responsively and adequately addressed the SEB's concerns. AR at 4433–43, 4444–53. By electronic mail transmissions to Dynacs and FDC on July 19, 1999, the CO posed further discussion questions based on the responses received on July 6, 1999. AR at 4454–55, 4462–64.

### 3. SEB's Request for Final Proposed Revisions # 1 (FPR# 1)

On August 3, 1999, the SEB Chairperson, Joyce Wanhainen, mailed by electronic transmission to Dynacs and FDC certain "clarification" questions "based on the SEB's review of [each offeror's] FCF [Fluids and Combustion Facility] cost proposal." AR at 4487–91. On August 17, 1999, the CO mailed to the offerors by electronic transmission a request for the submission of final proposal revisions (FPR# 1) by 4:30 p.m. on September 7, 1999. AR at 4492–95, 4496–99. Both offerors submitted timely FPR# 1 proposals. AR at 6283.

---

3. The court will consider and address the SEB's evaluations of the parties in this action only.

4. FDC's price included a 10% upward adjustment due to Dynacs's status as a small disadvantaged business. AR at 4013, 5285.

The SEB completed its evaluation of the offerors' FPR# 1 proposals on October 4, 1999 and presented "Final Findings" to the Source Selection Authority (SSA), NASA Director Donald J. Campbell, four days later. AR at 5292–5302, 5303–16, 5317–87. The SEB determined that Dynacs's Mission Suitability score rose [ ] points to [ ] and that FDC's Mission Suitability score dropped [ ] points to [ ].[5] AR 5302, 5316. While assigning [ ] ratings to the respective offerors for the Mission Suitability factor of the FPR# 1 proposals, AR at 1430, the SEB found that FDC had added "significant risk ... to their business approach" by "under-scop[ing]" the portion of the contract concerning the development and operation of the Fluids Combustion Facility (FCF). AR at 6283. Although Dynacs had no significant weaknesses, the SEB did identify [ ] weaknesses in its FPR# 1 proposal pertaining to the [ ]. AR at 1434, 5305, 6283.

After a review of the SEB's Presentation of Final Findings and a consultation with the agency's chief counsel and the contracting officer, the SSA determined that discussions would have to be reopened with the offerors, AR at 5388–89, because of the "significant risk" added to FDC's proposal. The CO noted, in a "Memorandum for Record" dated October 12, 1999, that "[s]ome of the areas that were underscoped were present in the Offeror's proposal prior to the FPR but had not been the subject of discussions with that Offeror." AR at 5388–89. The CO's subsequent actions, based on his view that certain underscoping in FDC's proposal was "present in the Offeror's proposal prior to the FPR but had not been the subject of discussions with that Offeror," now constitute the core of Dynacs' complaint, as discussed in Part II.B below.

4. SEB's Request for Final Proposal Revisions # 2 (FPR# 2)

By electronic mail transmissions on October 12, 1999 to Dynacs and FDC, the CO informed the offerors that discussions would be reopened to address new weaknesses identified in the Mission Suitability factor and other aspects of the submitted proposals affecting the cost realism analysis. AR at 5390–91, 5394, 5407. The CO further advised that discussions would be initiated by sending the SEB's findings of weaknesses and related questions regarding the FPR# 1 proposals. AR 5390–91. By electronic mail transmission dated October 13, 1999 to each of the offerors, the CO identified, in both Dynacs's and FDC's proposals, weaknesses in the Mission Suitability subfactor, Understanding the Requirements, and cost realism deficiencies. AR at 5392–5404, 5405–5423. Based on the SEB's expressed intention "to require only a limited revision of the FPR," the SEB set the due date for submissions of the second Final Proposal Revisions (FPR# 2) for October 22, 1999.[6] AR 5390–91.

Upon timely receipt and review of the offerors' FPR# 2 submissions, the SEB documented its findings on November 2, 1999. AR at 6069–77; 6079–90. The SEB assigned each offeror a "Very Good" adjectival rating for Mission Suitability and assigned a "Superior" rating to both Dynacs and FDC for Past Performance. AR at 6619–22. With regard to the Cost/Price component of the respective proposals, the SEB stated that Dynacs's proposed price "resulted in a cost

---

5. The Mission Suitability scores reflected the respective point adjustments for cost realism deviations in the proposals as prescribed by the RFP. *See* footnote 2.

6. By electronic mail transmissions to Dynacs and FDC on October 14, 1999, the SEB informed the offerors that the due date for the FPR# 2 proposals was rescheduled from October 22, 1999 to October 26, 1999. AR at 5425–26. In a "Memorandum for Record" dated October 14, 1999, the CO addressed the SEB's decision to extend the due date, stating:

Immediately after having received the discussion questions and the revised date for the FPR submittal, one of the Offerors remaining in the competitive range requested a week extension for the FPR submittal. The request was immediately forwarded to the MRDOC SEB Chairperson for consideration. After having discussed the request with the members of the SEB, and considering the short time-frame between the FPR submittal and the intended award date of the MRDOC contract, it was determined that it was in the best interest of the Government to grant an extension [of four days for the offerors to respond].

AR at 5427.

realism adjustment of less than 1 percent of their total proposed price." AR at 6621. As to FDC's proposal, the SEB stated that the "cost realism assessment was approximately 10 percent of their proposed price." AR at 6621.

### 5. The Contract Award

Based on the findings of the SEB, NASA's Director (the SSA) awarded the "unrestricted portion of the MRDOC procurement" to FDC. AR at 6622.

### C. The Post–Award Protests

Dissatisfied with the award to FDC, Dynacs filed a protest with the General Accounting Office (GAO).[7] GAO denied the protest on March 17, 2000. On March 31, 2000, Dynacs filed a complaint in this court pursuant to 28 U.S.C. § 1491(b).

## II. Discussion

### A. Standard of Review

This court has jurisdiction over Dynacs's post-award bid protest action under the 1996 amendments to the Tucker Act. 28 U.S.C. § 1491(b)(1) (Supp.III 1997). The court reviews the challenged agency action according to the standards set out in the Administrative Procedure Act (APA), 5 U.S.C. § 706 (1994). 28 U.S.C. § 1491(b)(4).

 The court must determine whether or not defendant's actions toward Dynacs were:

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] (D) without observance of procedure required by law....

5 U.S.C. § 706(2). *See Southfork Sys., Inc. v. United States*, 141 F.3d 1124, 1132 (Fed. Cir.1998). The complainant must demon-

strate by a preponderance of the evidence that defendant's actions towards it were either without a reasonable basis or violated applicable procurement law. *GraphicData, LLC v. United States*, 37 Fed.Cl. 771, 779 (1997). In addition, the " 'protestor must show not only a significant error in the procurement process, but also that the error prejudiced it.' " *Candle Corp. v. United States*, 40 Fed.Cl. 658, 665 (1998) (quoting *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed.Cir.1996)). *See also* 5 U.S.C. § 706 ("due account shall be taken of the rule of prejudicial error"); *Central Ark. Maintenance, Inc. v. United States*, 68 F.3d 1338, 1342 (Fed.Cir.1995) (stating only clear and prejudicial violations warrant relief). To demonstrate prejudice, "the protester must show 'that there was a substantial chance it would have received the contract award but for th[e] error.' " *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir.1999) (quoting *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1582 (Fed.Cir.1996)). *See also ACRA, Inc. v. United States*, 44 Fed.Cl. 288, 296–97 (1999).

We decide this case on cross-motions for summary judgment on the administrative record by Dynacs, the government, and FDC. Motions for judgment upon the administrative record are treated in accordance with the rules governing motions for summary judgment. RCFC 56.1(a); *see Nickerson v. United States*, 35 Fed.Cl. 581, 588 (1996), *aff'd*, 113 F.3d 1255 (Fed.Cir.1997). Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Jay v. Secretary of Dept. of Health and Human Serv.*, 998 F.2d 979, 982 (Fed.Cir.1993). A fact is material if it might significantly affect the outcome of the suit under the governing law. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. The court may review an agency's

---

**7.** Dynacs initially protested the contract award on the grounds that NASA "misevaluated its and the awardee's proposals, held improper discussions with the awardee and conducted an inadequate cost/price/technical tradeoff." *Dynacs Eng'g. Co., Inc.*, 2000 WL 330078, at *1 (Comp.

Gen. Mar.17, 2000). After commencing the protest before GAO, Dynacs filed a supplemental protest alleging that NASA did not adequately document the decision to reopen discussions. *Id.* at *4. GAO denied the protests. *Id.* at *1, 5.

procurement action on cross-motions for judgment on the administrative record "because the issues are matters of contractual and regulatory interpretation." *See Analytical & Research Tech., Inc. v. United States,* 39 Fed.Cl. 34, 43 (1997).

### B. The SEB's Discussions with the Offerors

#### 1. Dynacs's Allegations of Unfairness

Dynacs alleges that NASA "[a]llow[ed] FDC multiple opportunities to bring its proposal closer to the quality of Dynacs's proposal, without allowing Dynacs a similar opportunity to improve the areas in which it was relatively weaker than FDC." Compl. ¶ 34. Those multiple opportunities to improve, Dynacs complains, constituted unfair and unequal treatment of the offerors in violation of FAR §§ 1.102(b)(3) and 15.306(d)(3). *Id.* Dynacs contends that, after evaluating the FPR# 1 submissions of the offerors, NASA improperly reopened discussions "to elicit an improvement in FDC's proposal." *Id.* at ¶ 30.

Dynacs's claim is that "NASA stated the discussions following FPR# 1 would not address weaknesses remaining after the initial round of discussions (i.e., pre-FPR# 1)." Plaintiff's Memorandum of Points and Authorities in Support of its Motion for Judgment on the Administrative Record (Pl.'s Mot.) at 10. *See* AR at 6242. But, Dynacs argues, "NASA nevertheless discussed with FDC each and every weakness identified in the SEB's findings at FPR# 1 which existed prior to FDC's FPR# 1 submission." Pl.'s Mot. at 10. Dynacs alleges that, while not telling Dynacs about its continuing weaknesses, "NASA kept informing FDC about each of those weaknesses until FDC got it right." *Id.*

In addition, Dynacs contends that, in contravention of FAR § 15.306(d)(3), the con-

tracting officer failed to discuss with Dynacs two aspects of its proposal that did not contain identified weaknesses but, if improved as a result of discussions, could have "enhanced materially" its chances for the contract award. *Id.* at 18. Dynacs specifically points to NASA's failure to "discuss the *scope of work* proposed by Dynacs (which affected price) and the offeror's share ratio."[8] *Id.*

#### 2. The Law Governing Reopened Discussions

In determining whether defendant unfairly favored FDC during reopened discussions with the offerors after submission of the FPR# 1 proposals, the court must apply the law governing discussions between a procuring agency and offerors during a source selection.

The FAR authorizes discussions between the government and offerors once the competitive range is established in a procurement for the purpose of allowing an offeror to revise its proposal. FAR § 15.306(d). Such discussions, which are defined in the FAR as "exchanges," are intended to maximize the government's ability to obtain the "best value" in a contract award based on the requirements and the evaluation factors set forth in the solicitation. *Id.* § 15.306(d)(2).

FAR § 15.306(d)(1) requires that the contracting officer conduct discussions with each offeror within the competitive range. *Id.* § 15.306(d)(1). Subsection (d)(3) of the regulation adds:

> The contracting officer shall . . . indicate to, or discuss with, each offeror still being considered for award, significant weaknesses, deficiencies, and other aspects of its proposal (such as cost, price, technical approach, past performance, and terms and conditions) that could, in the opinion of the contracting officer, be altered or explained to enhance materially the proposal's potential for award.

---

**8.** The citations to the administrative record accompanying Dynacs's allegation regarding the proposed "scope of work" indicate that the issue is Dynacs's approach to scoping the FCF Development Program. *See* AR at 4039–42; 4454–55; 4487–88; 5393–5396. Dynacs explains the "share ratio" issue in the footnote accompanying this allegation in its briefing:

> The "share ratio" described the percentage of every dollar of cost overrun NASA would be required to absorb. FDC's share ratio of [ ] indicated that it would absorb [ ] of any cost overrun. Dynacs's share ratio represented Dynacs's intent to [ ] absorb of any cost overrun. Pl.'s Mot. at 18 n. 4.

FAR § 15.306(d)(3). The FAR comments that "[d]iscussions are tailored to each offeror's proposal." *Id.* § 15.306(d)(1).

■ The law is well-settled that discussions between a contracting officer and offerors must be meaningful. *See, e.g., Advanced Data Concepts v. United States,* 43 Fed.Cl. 410, 422 (1999), *aff'd,* 216 F.3d 1054 (2000); *Biospherics, Inc.,* 2000 WL 1009497, *4 (Comp.Gen. Jul.13, 2000) ("The statutory and regulatory requirement for discussions with all competitive range offerors ... means that such discussions must be meaningful"); *CRAssociates, Inc.,* 2000 WL 365909, *5 (Comp.Gen. Mar.15, 2000) ("It is a fundamental precept of negotiated procurement that discussions, when conducted, must be meaningful").[9] To be meaningful, discussions must include sufficient information "as to the areas in which [the offerors'] proposals are believed to be weak so that the offerors have a reasonable opportunity to address those areas of weakness which could have a competitive impact." *Bionetics Corp.,* 1998 WL 951702 *3 (Comp.Gen. Oct.14, 1998). An agency's failure to advise an offeror, in some way, of material proposal deficiencies vitiates the meaningfulness of the discussions. *See CRAssociates,* 2000 WL 365909 at *5. Moreover, questions and requests for clarifications which do not address critical deficiencies in an offeror's proposal do not constitute meaningful discussions. *See Mechanical Contractors, S.A,* 1998 WL 90737, *5 (Comp.Gen. Mar.4, 1998).

■■ There is, however, no requirement that all areas of a proposal which could have a competitive impact be addressed in discussions. Discussions must only address "areas of weakness." The procuring agency does not have to identify "each and every item that could be raised as to improve its proposal." *KBM Group, Inc.,* 1999 WL 449472 *6 (Comp.Gen. May 3, 1999). As this court observed in *Cube Corp. v. United States,* "[t]he government 'need not discuss every aspect of the proposal that receives less than the maximum score or identify relative weaknesses in a proposal that is technically ac-

ceptable but presents a less desirable approach than others.' " *Cube Corp.,* 46 Fed.Cl. 368, 384 (2000) (quoting *ACRA, Inc. v. United States,* 44 Fed.Cl. 288, 295–96 (1999)).

■ Nonetheless, the procuring agency must avoid conducting prejudicially unequal discussions. *See, e.g., Cubic Defense Systems, Inc. v. U.S.,* 45 Fed.Cl. 450, 471 (1999); *Synetics, Inc. v. United States,* 45 Fed.Cl. 1, 17 (1999); *Information Network Sys., Inc.,* 2000 WL 797436, at *6 (Comp.Gen. Jun.12, 2000); *Techniarts Science & Tech. Corp.,* 1998 WL 729188, at *4 (Comp.Gen. Oct.15, 1998); *Bionetics,* 1998 WL 951702, at *3. The FAR requires "integrity, fairness and openness" in procurements conducted under the Federal Acquisition System. FAR § 1.102(b)(3). Section 15.306(e)(1) of the FAR specifically states that "[g]overnment personnel involved in the acquisition shall not engage in conduct that favors one offeror over another."

### 3. Analysis of the Reopened Discussions

Plaintiff's complaint that NASA improperly conducted reopened discussions is two-pronged. First, Dynacs asserts that, after FPR# 1, the agency unfairly discussed with FDC weaknesses in its proposal which had been identified to FDC before FPR# 1 without discussing with Dynacs the surviving weaknesses in its FPR# 1 proposal which had been identified to Dynacs before FPR# 1. Second, Dynacs asserts that NASA erred in failing to address during post-FPR# 1 discussions two additional areas of its proposal, namely, its price (determined by the proposed scope of its FCF Development Program) and its share ratio, which although not viewed as weaknesses by NASA, could have improved materially its chances for the MRDOC award.

The court first addresses the second prong of Dynacs's argument—the allegation that NASA violated applicable law by failing to conduct discussions with Dynacs regarding aspects of its proposal that were neither deficiencies nor weaknesses.

---

9. While the decisions of the GAO do not bind this court, the reasoning of the Comptroller General provides useful guidance to the court. *See Plan-*

*ning Research Corp. v. United States,* 971 F.2d 736, 740 (Fed.Cir.1992); *Honeywell, Inc. v. United States,* 870 F.2d 644, 647–49 (Fed.Cir.1989).

a. Neither Dynacs's proposed share ratio nor its offered price/cost required discussion

The agency's justification for the award to FDC cited FDC's favorable share ratio and lower price/cost. AR at 6287. Dynacs complains that NASA's failure to discuss either of these aspects of its proposal after its submission of FPR# 1 compromised Dynacs's chances for the contract award. Pl.'s Mot. at 18–19. That failure, Dynacs contends, constitutes a breach of NASA's obligations under the FAR and the Competition in Contracting Act of 1984 (CICA), 41 U.S.C. § 253b(d)(2), which, in the case of the FAR, require the agency to discuss of those aspects of an offeror's proposal that could, in the opinion of the contracting officer, be altered to enhance materially the offeror's potential for the contract award or, in the case of CICA, "effectively require agencies to point out weaknesses, deficiencies or excesses in proposals necessary for an offeror to have a reasonable chance of being selected for award, which is, after all, the basis for including a proposal in the competitive range in the first place." *Department of the Navy–Recons.*, 1993 WL 190302, at *2 (Comp.Gen. May 28, 1993).

Dynacs's argument, however, is unavailing because NASA determined that the offeror's proposed share ratio and the offered price/cost were acceptable and therefore, did not require discussion. *See* AR at 1650, 6117–18 ("Offeror had minor technical adjustments to their proposal and revised their FPR price to reflect the technical risks identified to them during [post-FPR# 1] discussions. The FPR proposal reflects a sound understanding of the FCF development effort."); and 6127–36 (excerpt of cost-risk analysis reflecting the deletion of cost risk in 24 of the 27 noted areas of concern in Dynacs's proposal); *see also* Def.'s Mot. at 3, 15, 20.

In the solicitation, NASA required offerors to propose a cost sharing ratio for the incentive fee portions of the contract. AR at 1222, 1265. The solicitation stated that the maximum risk the government would accept is an 80/20 share ratio for costs which underrun or overrun target costs.[10] *Id.* at 1223, 1650.

The proposed share ratio of the offerors reflected the amount of the price/cost risk the contractor agreed to assume. *See* Def.'s Mot. at 15. Dynacs proposed a[ ] cost share ratio. AR at 2557. Because Dynacs's proposed share ratio fell within the acceptable range prescribed in the solicitation, the agency did not regard the share ratio as a weakness. *See* Def.'s Mot. at 16.

Nor did the agency view Dynacs's price/cost as a weakness. *See* Def.'s Opp. at 14. Rather, in a Memorandum for Record after receipt of the initial proposals for the MRDOC award (included within the Presentation of the Competitive Range of the Unrestricted Portion to the Source Selection Authority), the CO stated that "[a]ll Offerors['] proposed prices were within a reasonable range of the funding profile provided as part of the RFP" AR at 4031. Accordingly, the agency did not address Dynacs's proposed price/cost as a weakness in the discussions after FPR# 1.

The agency's decision is supported by the case law. In *Cube Corp.*, this court recently observed:

In the requirement to have "discuss[ions] with" or provide "indicat[ions] to" offerors, the [FAR] speaks of significant weaknesses and deficiencies, and matters "that could, in the opinion of the contracting officer, be altered or explained to enhance materially the proposal's potential for award." 48 C.F.R. § 15.306(d)(3). A "significant weakness" is defined by the FAR as "a flaw [in the proposal] that appreciably increases the risk of unsuccessful contract performance." 48 C.F.R. § 15.301.... Plaintiff has not convinced the court that the disadvantages which were not shared with Cube meet these somewhat stringent definitions. The disadvantages listed above do not rise to the level of "material failures," rendering the risk of unsuccessful contract performance unacceptable, or constitute flaws of such magnitude that appreciably increase the risk of unsuccessful contract performance....

10. The share ratio most favorable to the government is 0/100. *See* Def.'s Mot. at 15.

*Cube Corp.*, 46 Fed.Cl. at 383–84. The reasoning of the court in *Cube Corp.* is equally applicable to the circumstance in this case. *See also AJT & Associates, Inc.*, 2000 WL 353102, *7 (Comp.Gen. Mar.27, 2000) (GAO interpreted the permissive language of FAR § 15.306(e) to give the contracting officer discretion to inform an offeror that its cost/price is too high, but does not require discussion if the agency "does not consider the cost/price a significant weakness or deficiency that the offeror could alter ... to enhance the proposal's potential for award").[11]

 Dynacs's proposal was acceptable in the areas of share ratio and cost/price. Indeed, Dynacs clearly understood and acknowledged the possible competitive disadvantage reflected in these aspects of its proposal: [ ]. AR at 2557. The administrative record does not indicate that either the share ratio or the cost/price portion of Dynacs's proposal was, as contemplated by the FAR, a significant weakness or flaw that appreciably increased the risk of unsuccessful contract performance. *See* 48 C.F.R. § 15.301. The FAR affords a procuring agency broad discretion in conducting discussions to obtain the best value for the government. *See* FAR § 15.306(d)(3). In the exercise of such discretion, a contracting officer need not discuss all areas in which a proposal could be improved. *See KBM Group, Inc.*, 1999 WL 449472, at *6; *MCR Federal, Inc.*, 1998 WL 953965, at *7 (Comp.Gen. Dec.14, 1998). In this case, the court cannot find that NASA acted arbitrarily and capriciously when it did not address the share ratio and cost/price aspects of Dynacs's proposal. *See GraphicData*, 37 Fed.Cl. at 779.

b. NASA's discussion with FDC—but not Dynacs—of previously identified weaknesses was a significant and prejudicial error

 After receiving the offerors' initial proposals, NASA conducted written discussions with Dynacs and FDC by letters dated June 16, 1999. *See* AR at 4037–56 4064–83. In the letters to Dynacs and FDC, the agency specifically identified "weaknesses" in the

offerors' proposals in the areas of Mission Suitability and Past Performance. *Id.* NASA also posed to both offerors "additional questions" in the areas of Mission Suitability and Past Performance and asked "business proposal questions." *Id.* Significantly, NASA designated different categories of inquiry during the June 16, 1999 discussions with the offerors, categories which the agency later relied on in defending the scope of post-FPR# 1 discussions.

Upon receiving the offerors' responses to its June 16, 1999 questions, the agency posed further questions to both offerors by electronic mail transmissions dated July 19, 1999. *See* AR at 4454–55, 4462–64. NASA also mailed to the offerors by electronic transmissions dated August 3, 1999 "clarification" questions pertaining to each offeror's Fluids and Combustion Facility (FCF) cost proposal. *See* AR at 4487–91. After this series of communications, the agency accepted FPR# 1 proposals from Dynacs and FDC in September 1999.

Upon receiving the FPR# 1 proposals and after completing the cost realism analysis, the agency determined that "significant risk had been added" to FDC's proposal. AR at 5388. The CO specifically noted in a Memorandum For Record dated October 12, 1999:

The FCF Cost Evaluation found many areas that were either underscoped or were not consistent with the technical approach described in the FCF Contractor Project Plan. *Some of the areas that were underscoped were present in the Offeror's proposal prior to the FPR but had not been the subject of discussions with that Offeror.* Secondly, there were found to be significant issues in their Business Proposal regarding their ability to recover costs because [ ]. These findings were considered a significant risk on that Offeror's ability to successfully perform the MRDOC contract.

*Id.* at 5388–89 (emphasis added). The agency decided to reopen discussions. In a letter to each offeror, NASA explained:

The intent of these discussions is to address only new weaknesses established as

---

11. FAR § 15.306(e)(3) states that "the contracting officer may inform an offeror that its price is considered by the Government to be too high, or too low."

a result of the FPR review of the Mission Suitability Factor and contractor plan resources listed in the Business Volume and to address other areas in the FCF Contractor Plan that have made an impact on the cost realism analysis.

AR at 5394, 5407. Accordingly, by electronic mail transmissions dated October 13, 1999 to each of the offerors, the agency identified, in both Dynacs's and FDC's FPR# 1 proposals, weaknesses in the Mission Suitability Factor, Understanding the Requirements, and the cost realism deficiencies. *See* AR at 5392–5404, 5405–5423.

Despite the apparent parallelism of the agency's discussions with the offerors, the court finds that the discussions were indeed unfair. Dynacs complains that, contrary to the agency's representations, NASA identified nine items as "weaknesses" in FDC's initial proposal and addressed the same weaknesses for a second time during reopened discussions after the submission of FDC's FPR# 1 proposal.[12] Pl.'s Mot. at 10–13.

The administrative record shows that six of the nine items, specifically, [ ] were identified initially by NASA to FDC before FPR# 1 as "additional questions" rather than as weaknesses. *See* AR at 4068, 4490–91. Nor was [ ] addressed as a weakness in FDC's initial proposal but rather as a "clarification question." *See* AR at 4464. Dynacs is correct, however, that two items in the Mission Suitability subfactor, Understanding the Requirements, particularly, "the FCF [Fluids and Combustion Facility] systems engineering approach," and [ ] were identified to FDC as "weaknesses" in the agency's *written discussion letter of June 16, 1999.* AR at 4068.

NASA's position is that the weaknesses addressed in the pre-FPR# 1 letter of June 16, 1999 to FDC, although affecting the same areas of FDC's proposal, are different from the weaknesses addressed during the reopened discussions with FDC after the FPR# 1 submissions. Def.'s Opp. at 8–9. That distinction is simply not apparent to the court.

In the *Mission Suitability subfactor, Understanding the Requirements,* NASA informed FDC of a weakness in its initial proposal with respect to the Fluids Combustion Facility Contractor Project Plan, stating: [ ]. AR at 4068 (italics in original). After FPR# 1, NASA addressed the same weakness, stating: [ ]. AR at 5407. The weakness, both before and after FPR# 1, is FDC's failure to convince the government that FDC understands the requirement to [ ]. The agency suggests that the unresponsiveness of the offeror in its initial proposal is different from the defect of underscoping evidenced in the FPR# 1 proposal. Defendant's Reply to Plaintiff's Opposition to Defendant's Cross–Motion for Judgment upon the Administrative Record (Def.'s Rep.) at 5, 6; AR at 5388–89. The court finds this distinction unpersuasive. The [ ] problem was not new. The effort of FDC to document its approach in FPR# 1 only served to underscore the inadequacy in FDC's understanding.

NASA also identified as a weakness in FDC's initial proposal in the Mission Suitability subfactor, Understanding the Requirements, the [ ]. AR at 4068 (italics in original). *After FPR# 1, NASA addressed the same weakness, stating:* [ ]. AR at 5407–08. Again, the exact area of weakness in FDC's understanding of a requirement was identified by NASA to FDC after submission of initials proposals and again after FPR# 1. This is not, as NASA suggests, an area where weakness only became apparent after a cost realism analysis.[13] Def.'s Rep. at 5, 6.

---

**12.** The nine weaknesses were: *(1)* the FCF [Fluids and Combustion Facility] systems engineering approach, AR at 4068; *(2)*[ ] AR at 4491; *(3)*[ ] AR at 4490; *(4)*[ ] AR at 4491; *(5)*[ ] AR at 4464; *(6)*[ ] AR at 4491; *(7)*[ ] AR at 4491; *(8)* AR at 4068; and *(9)*[ ] AR at 4068.

**13.** In Plaintiff's Reply Memorandum in Support of its Motion for Judgment on the Administrative Record (Pl.'s Rep.), Dynacs points to three more

"weaknesses" it alleges were identified to FDC both before and again after FPR# 1. Plaintiff alleges that in the pre-FPR# 1 letter of June 16, 1999 to FDC, NASA informed FDC of weaknesses in the Mission Suitability subfactor, Understanding the Requirements, in the areas of [ ] and [ ]. Pl.'s Rep. at 7. Plaintiff adds that NASA also informed FDC of a weakness in the Mission Suitability subfactor, Management Plan, in the area of [ ]. *Id.* at 8. Plaintiff complains that NASA

Instead, the cost realism analysis underscored the existing weakness, but did not result in the identification of a new weakness.[14]

In contrast, although the SEB identified five weaknesses in Dynacs's FPR# 1 proposal, it limited its discussion to the two new weaknesses discovered in the FPR# 1 proposal. *See* AR at 5360, 5394. It did not address the three weaknesses that it had identified previously in Dynacs's initial proposal. *Compare* AR at 4039, 4043 *with* AR at 5360. Of the three weaknesses identified in Dynacs's initial proposal, two were in the Mission Suitability factor, Understanding the Requirements: (1) an inadequately described approach to using ground based systems and inadequately defined "timeframes" for the systems, and (2) an inadequate description of Dynacs's relationship with the PI [Principal Investigator] during the flight hardware development process. AR at 5294. The third weakness identified in Dynacs's initial proposal in the Mission Suitability factor, Management Plan, was an inadequate description of the roles and responsibilities of the temporary and permanent staff. AR at 5297. The three weaknesses identified to Dynacs in its initial proposal—but not discussed during reopened discussions—were the *only* weaknesses identified in Dynacs's FPR# 2 proposal. *See* AR at 6284.

The agency explains that the difference in the number of discussion points with the offerors during the reopened discussions may be attributed to: (1) a determination "that FDC had more uncertainties and problems in its initial proposal than Dynacs," as disclosed by the agency's cost analysis of the proposals, and (2) NASA's lack of understanding [of the "more serious shortcomings" in its prior

discussions with FDC] before the completion of the cost realism analysis. In NASA's view, it limited its reopened discussions with the offerors to "new weaknesses it found in the cost realism analysis" and to those previously identified areas requiring clarification but not identified expressly as "weaknesses." Defendant's Opposition to Plaintiff's Cross-Motion for Judgment on the Administrative Record (Def.'s Opp.) at 6. Citing the GAO's decision in *CRAssociates, Inc.*, 2000 WL 365909 (Comp.Gen. Mar.15, 2000), defendant stated at oral argument, "When a agency asks questions or clarifications without identifying the deficiency as a weakness or as a major problem area, then that is not meaningful discussions." Tr. at 25–26. Defendant contends that the SEB sought approval from the SSA to reopen discussions after "conclud[ing]" that the discussion, follow-on and clarification questions leading to [FPR# 1] had not adequately put the offerors on sufficient notice of the existence and the extent of *all* the weaknesses in their initial proposals, as the Evaluation Plan required NASA to do." Def.'s Mot. at 12; AR at 5388–89.

The agency's position with respect to those issues that it first identified to FDC as questions and requests for clarifications during pre-FPR# 1 discussions, and subsequently identified as weaknesses during reopened discussions, is consistent with its statutory mandate under FAR § 15.306(d)(3) and with the case law. *See Biospherics*, 2000 WL 1009497, at *8 ("In an abundance of caution, the contracting officer reopened discussions to clarify [an] issue and obtained answers that satisfied his concerns."); *KBM Group*, 1999 WL 449472, at *8 ("[A] procuring agen-

---

identified the same weaknesses to FDC during reopened discussions after the FPR# 1 submissions. *Id.* at 7, 8. The administrative record shows that by letter dated June 16, 1999, NASA first identified to FDC these three areas as weaknesses. AR at 4066, 4070. NASA discussed these same areas again with FDC during reopened discussions after FPR# 1. *See* AR at 5408, 5409, 5410. In fact, by letter dated October 13, 1999, NASA specifically identified FDC's [ ] as a weakness and addressed the FDC's proposed [ ] and [ ] as underscoped areas affecting the cost realism of the proposal. *Id.* Plaintiff's complaint is well-founded. The record supports

a finding that these areas of weakness in FDC's proposal were disclosed prior to the cost realism analysis.

**14.** The agency assessed the combination of the identified weaknesses in FDC's FPR# 1 submission to be a significant weakness in the offeror's proposal. *Id.* at 5408. The agency also informed FDC that certain other of its BOEs [Basis of Estimates] were inadequately scoped for cost realism purposes. *AR* at 5408–14. The agency provided similar information to Dynacs. *Id.* at 5394–95.

cy should tailor its discussions to each offer since the need for clarifications or revisions will vary with the proposals."); *Mechanical Contractors, S.A,* 1998 WL 90737, at *5 ("Although the [agency] asked [the offeror] to clarify certain portions of its original proposal and allowed [the offeror] to submit a BAFO incorporating [the offeror's] clarifications after the original evaluation, such action did not constitute meaningful discussions because those clarifications were solicited before the reevaluation took place and [the offeror] was not informed of the critical deficiencies."). Thus, the court finds no error in that portion of NASA's discussions with FDC.

The court does find error, however, in NASA's discussions with FDC regarding weaknesses in its proposal, which were identified prior to and remained after the submission of FDC's FPR# 1 proposal, without discussing the weaknesses in Dynacs's proposal identified prior to and remaining after its FPR# 1 submission.[15] The error is NASA's failure to afford Dynacs a similar opportunity in contravention of FAR § 15.306(e)(1). The record indicates that NASA inconsistently applied its internal (and announced) guidance for conducting reopened discussions with the offerors. The inconsistency, in the context of this procurement, was unfair.

Dynacs may establish prejudice in this procurement process by showing "that there was a substantial chance it would have received the contract award but for th[e] error." *Alfa Laval,* 175 F.3d at 1367 (quoting *Statistica,* 102 F.3d at 1582). As evidence of its "substantial chance" to have received the award, plaintiff points to the agency's determination that:

At the completion of the evaluation [of the FPR# 1 submissions,] it was found that *significant* risk had been added to [FDC's] technical and business approaches....

These findings were considered a significant risk on that Offeror's ability to successfully perform the MRDOC contract. AR at 5388–89 (emphasis added). Plaintiff specifically quantifies that risk, as documented in the administrative record, stating:

The SEB found there was distributed cost risk in the amount of [ ]. (AR 5381). The SEB further found the FCF technical cost risks in FDC's proposal totaled [ ]. (AR 5382). Thus, the SEB determined that there existed a total cost risk of approximately [ ] associated with FDC's proposal.[16] Inasmuch as FDC proposed a total price of [ ], this meant that FDC's proposal had an eye-popping [ ] cost risk at the end of FPR# 1. In contrast, Dynacs' total cost risk equaled [ ] or [ ] of Dynacs' proposed cost. (AR 5382).

*See* Plaintiff's Memorandum of Points and Authorities in Opposition to Defendant's and Intervenor's Cross–Motions for Judgment on Administrative Record at 10–11. As counsel for plaintiff stated during oral argument:

NASA ... allowed FDC the opportunity [to] redeem a fallen proposal.... There was nothing wrong with NASA's discussions. Up to the point of FPR–1, there was nothing objectionable to this procurement or how it was conducted. There would not even be anything wrong if NASA had given multiple opportunities to FDC provided only that they gave multiple opportunities to Dynacs, which they admit they did not. That's why Dynacs was fundamentally prejudiced because at the end of FPR–1 they had a better proposal than FDC was able to create.... [A]nd even NASA in its briefing admitted that at FPR–1 FDC could not perform the work for the price proposed.

Tr. at 63–64.

NASA, in fact, assessed the cost risk associated with FDC's proposal after the submission of the FPR# 1 proposals as follows:

---

**15.** The error, as correctly observed by the Comptroller General in the GAO protest, is not "multiple discussions regarding an issue." *See Dynacs Eng'g. Co.,* 2000 WL 330078, at *3. The court agrees with GAO that "[n]othing in the regulation suggests that further discussions on an issue are impermissible simply because they may occur on separate occasions, over a period of time." *Id.*

**16.** The SEB's Summary Chart, contained in the Presentation of Final Findings to Source Selection Authority after FPR# 1, failed to list the total cost risk. (AR 5387). In contrast, the SEB's Summary Chart for the Presentation of Final Findings to Source Selection Authority at the conclusion of FPR# 2 expressly listed the total cost risk for both offerors. (AR 6277). [This footnote was numbered 7 in the original text.]

With respect to FDC, procurement officials were concerned that "[s]ome of the areas that were underscoped were present in the Offeror's proposal prior to the FPR, but had not been the subject of discussions with that Offeror." AR 5382. These pre-existing initial proposal weaknesses represented about $11M in cost risk from under-scoping.

Def.'s Mot. at 12. Moreover, the agency observed:

Only as the cost analysis progressed were more clarifications posed to FDC than to Dynacs, reflecting NASA's increasing curiosity concerning how FDC had been able to propose such a low priced offer. AR 4488, 4490–4491. Finally, when the cost analysis was completed, more new weaknesses were identified regarding FDC (5) than regarding Dynacs (2), indicating NASA's judgment that the work could not be done for the price FDC proposed.

Def.'s Rep. at 8.

The government itself acknowledges that, after FPR# 1, FDC had not put forward a complete and acceptable proposal. The Federal Circuit has instructed that when one offeror's proposal is unacceptable in a two bidder competitive range, the court must find that the unsuccessful offeror had a "'substantial chance'" to receive the contract award absent the agency's error in awarding the contract. *See Alfa Laval*, 175 F.3d at 1368. The court concludes that Dynacs has satisfied its burden of proving by a preponderance of the evidence that NASA committed a significant, prejudicial error in the procurement process. *See id.; Statistica*, 102 F.3d at 1581; *Data Gen.Corp.*, 78 F.3d at 1562.

III. Conclusion

For the foregoing reasons, the court sustains plaintiff's protest. Plaintiff's Motion for Judgment on the Administrative Record is GRANTED. Defendant's and Intervenor's Motions for Judgment Upon the Administrative Record are DENIED. Accordingly, the court ORDERS the following:

1. On or before October 27, 2000, the parties shall file with the Clerk of the Court jointly, if the parties are able to agree, or separately, if the parties are unable to agree, a status report proposing further proceedings to address the proper remedy for plaintiff in this case.

2. On or before October 13, 2000, the parties shall file requests for deletion of protected/privileged material from the published opinion to be issued by the court. Each such request shall identify with particularity the proposed deletion and the reason therefor. IT IS SO ORDERED.