# United States Court of Appeals for the Federal Circuit

---

**ESKRIDGE & ASSOCIATES,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

**ANSIBLE GOVERNMENT SOLUTIONS, LLC,**
*Defendant*

---

2019-1862

---

Appeal from the United States Court of Federal Claims in No. 1:18-cv-02001-CFL, Senior Judge Charles F. Lettow.

---

Decided: April 15, 2020

---

TIMOTHY TURNER, Whitcomb, Selinsky, PC, Denver, CO, argued for plaintiff-appellant.

TANYA KOENIG, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee. Also represented by JOSEPH H. HUNT, ROBERT EDWARD KIRSCHMAN, JR., DOUGLAS K. MICKLE.

---

Before PROST, *Chief Judge,* SCHALL and WALLACH, *Circuit Judges.*

WALLACH, *Circuit Judge.*

Appellant Eskridge & Associates ("Eskridge") filed a bid protest in the U.S. Court of Federal Claims, protesting the award of a U.S. Department of the Army ("Army") contract to a competitor. Following Eskridge's motion for judgment on the administrative record, the Court of Federal Claims concluded that Eskridge lacked standing, as it was not an interested party pursuant to 28 U.S.C. § 1491, and dismissed the protest. *See Eskridge & Assocs. v. United States*, 142 Fed. Cl. 410, 425 (2019) (Opinion and Order); Judgment, *Eskridge & Assocs. v. United States*, No. 18-2001 (Fed. Cl. Mar. 19, 2019), ECF No. 26.

Eskridge appeals. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3). We affirm.

## BACKGROUND[1]

In 2016, the Army sought to procure the services of certified registered nurse anesthetists ("CRNAs") for the Womack Army Medical Center, located in Fort Bragg, North Carolina, by issuing a solicitation ("the 2016 Solicitation"). *See Eskridge*, 142 Fed. Cl. at 412–13. Relevant here, the Army performed a price realism analysis of the proposals made in response to the 2016 Solicitation. *Id.* at 412. Eskridge bid on the 2016 Solicitation, but the solicitation was cancelled in 2017 in connection with a corrective action ("the 2017 Protest"). *Id.* Later in 2017, the Army released a preview for a new solicitation for the CRNAs at Fort Bragg. *Id.* at 413. The preview outlined

---

[1] Unless otherwise noted, we will rely on the uncontested facts as presented by the Court of Federal Claims. *See generally* Appellant's Br., Appellee's Br. Where the parties disagree, we rely on the record.

the award of a contract on a fixed-price basis for a base period of six months, with the addition of four option years to follow, and estimated a cost of $21,034,111.20. *Id.* The preview also stated that performance was expected to commence on April 1, 2018 and to end by September 30, 2022. *Id.*

In early January 2018, the Army filed a solicitation with bids due three weeks later ("the 2018 Solicitation"). *Id.* In addition to listing various requirements and expectations, the 2018 Solicitation provided the method by which the Army intended to evaluate the bids—the "lowest price technically acceptable . . . approach." *Id.* (capitalization altered). Specifically, the 2018 Solicitation stated that the Army would "initially list proposals from lowest to highest price," and then "evaluate the technical acceptability of the five lowest-priced bids." *Id.* (internal quotation marks and citation omitted). If any of those five bids were rated technically acceptable, the Army would "not evaluate any other proposals," and instead "award the contract to the lowest-priced, technically acceptable bidder." *Id.* (internal quotation marks and citation omitted). The price "would act as a filter," allowing the Army to review only the five lowest-priced bids for the detailed technical evaluation. *Id.* The Army provided three categories to determine if a bid was technically acceptable: (1) "[g]eneral compliance with solicitation requirements"; (2) technical merit, scored on six subfactors; and (3) past performance. *Id.* (citation omitted). In the 2018 Solicitation, the Army set the minimum compensation rate for a CRNA at $113.89 per hour, inclusive of fringe benefits. *Id.* at 414. The addition of the minimum compensation rate—which had not been included in the 2016 Solicitation—was provided in lieu of the 2016 Solicitation's price realism analysis, as "the Army

believed the minimum acceptable wage rate acted as a price realism regulator[.]" *Id.*[2]

The Army received eighteen timely, complete proposals. *Id.* Before the Army could evaluate the proposals, however, Eskridge filed a pre-award protest with the Government Accountability Office ("GAO"), alleging that the Army "acted in bad faith" regarding the 2018 Solicitation— by failing to include language allegedly agreed upon following the 2016 Solicitation's cancellation—and that the 2018 Solicitation was ambiguous. *Id.* at 414–15 (internal quotation marks and citation omitted). The Army responded, requesting that the GAO dismiss the protest, contending that Eskridge failed "to allege facts upon which a legally sufficient assertion of bad faith could be based." *Id.* at 415 (internal quotation marks and citation omitted). The Army explained that its reference in the 2018 Solicitation to 48 C.F.R. § 52.222-46, which requires compensation realism evaluations, "fulfilled the Army's obligation arising from its informal agreement" after the 2016 Solicitation was cancelled. *Id.* (internal quotation marks and citation omitted); *see* 48 C.F.R. § 52.222-46.[3] Eskridge withdrew its

---

[2] The 2018 Solicitation was amended multiple times and included, inter alia, an increase to the minimum compensation rate to $121.22 per hour. *Id.*

[3] Section 52.222-46 provides for the evaluation of compensation for professional employees. The regulation requires that professional employees in the service of the federal government "be properly and fairly compensated," as it is "in the [federal government's] best interest." 48 C.F.R. § 52.222-46(a). Accordingly, the regulation provides requirements that proposals for the solicitations of professional employees undergo various evaluations to ensure that the employees are compensated at rates that will ensure "uninterrupted[,] high-quality work." *Id.* "Failure to

protest two days after the Army responded. *Eskridge*, 142 Fed. Cl. at 415.

After Eskridge withdrew its protest, the Army commenced its evaluation process. *Id.* The Army sorted the bids according to price; Eskridge's bid was not ranked among the five lowest proposals. *Id.* The Army conducted its technical evaluations of the lowest proposals and, finding three of the five to be technically acceptable, sent notifications to the thirteen unsuccessful bidders, including Eskridge. *Id.* The Army awarded the contract ("Contract") to Ansible Government Solutions, LLC ("Ansible"), after determining that Ansible provided the lowest-priced, technically acceptable proposal. *Id.* at 417.

In March 2018, Eskridge filed another protest with the GAO. *Id.* Eskridge alleged that the Army's determination was "unreasonable, capricious, and contrary to law" and that its "evaluation was ambiguous and contrary to the terms of the [2018] [S]olicitation." *Id.* (internal quotation marks and citation omitted). The Army requested that the GAO dismiss Eskridge's protest, arguing that Eskridge was not an interested party "because there were [multiple] proposals that were evaluated as [t]echnically [a]cceptable with . . . lower prices than [Eskridge's] proposal." *Id.* (citation omitted) (all alterations except ellipsis in original). On April 1, 2018, while proceedings were ongoing before the GAO, the Army signed the Contract with Ansible. *Id.* Eskridge filed a response to the Army's request for dismissal on April 6 and, on April 13, the Army issued a stop work order to Ansible. *Id.* at 417–18. On April 18, the Army took corrective action by issuing a memorandum that indicated it would "'revise the source selection documents in order to better document the selection and award process' and to 'review the evaluations of the proposals [to

---

comply . . . may constitute sufficient cause to justify rejection of a proposal." *Id.* § 52.222-46(d).

determine] if [Ansible] fully compl[ied] with'" the requirements of the 2018 Solicitation. *Id.* at 418 (citation omitted) (alterations in original).

In April 2018, the Army reevaluated the proposals as set forth in its corrective action memorandum. *Id.* The Army reviewed the ten lowest-priced bidders on both technical and past performances bases. *Id.* Five of the ten bidders were deemed technically unacceptable. *Id.* at 419. Of the five technically acceptable bidders, Eskridge bid the highest total price at $18,124,729.20. *Id.* Ansible's proposal bore the total price of $16,565,078.40. *Id.* The Army compared each line of the itemized proposed price against the independent government estimate ("IGE") to determine if each itemized price was fair and reasonable. *Id.*[4] Ansible's proposed prices were 14 to 25 percent less than the IGE, while Eskridge's proposed prices were between 13 to 14 percent below the IGE. *Id.* The Army awarded the Contract to Ansible and notified the nine unsuccessful bidders. *Id.* at 419–20.

In August 2018, Eskridge filed a post-award protest with the GAO, claiming the Army's determination process was "'ambiguous and contrary' to the solicitation, 'unreasonable, arbitrary, and contrary to law,'" and conducted in bad faith, alleging the Army did not adhere to the terms agreed upon following the 2016 Solicitation. *Id.* at 420

---

[4]    The IGE was an estimate "based upon [the Army's] assessment of base salaries paid in the local area as well as salaries paid on current contracts." J.A. 170. In the 2018 Solicitation, the Army determined it would review compensation as part of its technical evaluation of the proposals, and "[a] low, or no [c]ompensation [p]lan, may be viewed as evidence of failure to comprehend the complexity of the contract requirements or appropriate compensation levels for [the] geographic area where performance will take place." J.A. 170.

(internal citations omitted). Eskridge also argued that Ansible's bid and the other bids lower than its own were too close to the proposal's "minimum bid" of $15,186,441.60. *Id.* In November 2018, the "GAO dismissed Eskridge's protest, finding Eskridge was not an interested party." *Id.* at 421. Specifically, the GAO determined that Eskridge's arguments were "unpersuasive," as the other three unsuccessful bidders that had provided proposals with total prices lower than Eskridge's had "a more direct economic interest in this procurement." *Id.* (internal quotation marks and citation omitted). Additionally, the GAO found unpersuasive Eskridge's argument that the three other bidders with "proposed prices that were in the neighborhood of Ansible's also should [be] assessed as nonresponsive," as there was less than a $200,000 difference between Eskridge's bid and the next lowest bid. *Id.* (internal quotation marks and citation omitted).

In December 2018, Eskridge filed a complaint in the Court of Federal Claims, alleging that the "Army's decision to award the [C]ontract to Ansible [is] arbitrary, capricious, or contrary to law" and requesting the Court of Federal Claims to "issue a declaratory judgment that the Army's award was in violation of its own solicitation and of procurement laws" and to "order the Army to award the . . . [C]ontract to Eskridge." *Id.* at 412, 421. The Court of Federal Claims dismissed all of Eskridge's claims. *Id.* at 425. In doing so, the Court of Federal Claims first addressed whether Eskridge had a substantial chance of winning the Contract and concluded that it did not. *Id.* at 422–23. The Court of Federal Claims reasoned that all five technically acceptable bidders exceeded the minimum compensation rate required by the Army. *Id.* at 422. Second, the Court of Federal Claims determined that, because Eskridge's bid was valued within $200,000 of the next lowest bid, Eskridge's bid would fail alongside the other four lower bids under Eskridge's own argument that all bids "'in the neighborhood' of Ansible's were so low as to represent a

facially unreasonable bid." *Id.* at 422–23. Third, the Court of Federal Claims determined that "the claims of error Eskridge makes in this protest focus primarily on the Army's alleged failure to conduct a compensation realism analysis, which as a practical matter would affect each of the five lowest-priced, technically acceptable proposals equally." *Id.* at 423.

The Court of Federal Claims also addressed Eskridge's claim that the Army failed to incorporate terms it pledged to include following the 2017 Protest. *Id.* at 424. It concluded that Eskridge waived the issue, as a timely complaint would have come in a pre-award protest. *Id.* The Court of Federal Claims concluded that, in any event, the Army fulfilled its obligations following the 2017 Protest, as it "incorporated by reference [48 C.F.R.] § 52.222-46, which put all [bidders] on notice that the Army intended to conduct an analysis of compensation realism as part of the technical evaluation." *Id.* at 424–25. The Court of Federal Claims dismissed the Complaint, concluding that "because Eskridge offered the fifth highest technically acceptable bid and its protest does not make a credible challenge to the technical acceptability of four lower bids," "Eskridge cannot show a direct economic interest in the protest and consequently is not an interested party and lacks standing." *Id.* at 425.

DISCUSSION

I. Standard of Review and Legal Standard

"Whether a party has standing to sue is a question that [we] review de novo." *Am. Fed'n of Gov't Emps. v. United States,* 258 F.3d 1294, 1298 (Fed. Cir. 2001) (internal quotation marks and citation omitted). Section 1491 provides that the Court of Federal Claims

shall have jurisdiction to render judgment on an action *by an interested party* objecting to a solicitation by a Federal agency for bids or proposals for a

> proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement.

28 U.S.C. § 1491(b)(1) (emphasis added). The statute provides that the Court of Federal Claims shall have jurisdiction over an objection brought by "an interested party," but does not define the term. *See id.* § 1491.

We have held that the "interested party" term under § 1491 must be interpreted in accordance with the standing requirements provided by the Competition in Contracting Act ("CICA"), 31 U.S.C. §§ 3551–56. *See Am. Fed'n*, 258 F.3d at 1300–02; *see also Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1370 (Fed. Cir. 2002) ("[I]n our recent decision in *American Federation*, we held that [§] 1491(b)(1) did not adopt the [Administrative Procedure Act's] liberal standing standards, and that the narrower standards—consistent with the [CICA]—continued to apply." (internal citation omitted)). "In bid protests under [§ 1491], we . . . construe the term 'interested party' in [§] 1491(b)(1) in accordance with the [standing requirements of the] CICA and hold that standing under § 1491(b)(1) is limited to actual or prospective bidders or offerors *whose direct economic interest would be affected* by the award of the contract or by failure to award the contract." *Myers Investigative*, 275 F.3d at 1370 (third bracketed addition and ellipsis in original) (emphasis added) (internal quotation marks and citation omitted). We have stated that "[t]o prove a direct economic interest as a putative prospective bidder, [the protestor] is required to establish that it had a 'substantial chance' of receiving the contract." *Rex Serv. Corp. v. United States,* 448 F.3d 1305, 1308 (Fed. Cir. 2006)*; see Info. Tech. & Applications Corp. v. United States,* 316 F.3d 1312, 1319 (Fed. Cir. 2003) ("To establish prejudice, [the protestor] must show that there was a 'substantial chance' it would have received the contract award but for the alleged error in the procurement

process." (citation omitted)); *Statistica, Inc. v. Christopher,* 102 F.3d 1577, 1581 (Fed. Cir. 1996) (similar).

## II. Eskridge Lacks Standing to Bring a Protest

The Court of Federal Claims determined that Eskridge lacked standing to bring a post-award protest because it did not have a direct economic interest since it did not have a substantial chance of receiving the Contract. *See Eskridge*, 142 Fed. Cl. at 422–23. Eskridge contends that the Court of Federal Claims erred in concluding that it did not have a direct economic interest as it would have had a substantial chance of winning the Contract "but for the Army's errors in evaluating technical acceptability." Appellant's Br. 18. We disagree with Eskridge.

Eskridge bid on the 2018 Solicitation, so we focus our inquiry on whether Eskridge possesses the requisite direct economic interest. To be an interested party, a bidder must have a "direct economic interest [that] would be affected by the award of the contract." *Myers*, 275 F.3d at 1370. We conclude that Eskridge does not possess such a direct economic interest. In a post-award bid protest, the relevant inquiry is whether the bidder had a "substantial chance" of winning the award—specifically, whether a protestor "establish[ed] not only some significant error in the procurement process, but also that there was a substantial chance it would have received the contract award but for that error." *Statistica*, 102 F.3d at 1582; *see United States v. Int'l Bus. Machs. Corp.*, 892 F.2d 1006, 1010–11 (Fed. Cir. 1989) (concluding that a bid protestor had "at best, a trivial interest in the award" and therefore no economic interest where, if the protest were successful, the award would go to another party); *see also Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1334 (Fed. Cir. 2001) (summarizing cases). Eskridge failed to demonstrate that it would be in line for the Contract. First, even if Ansible was removed from the running for some reason, the award would go to one of the other three lower-priced,

technically acceptable bids that ranked before Eskridge, and Eskridge still would not have a substantial chance of winning the award. *See Eskridge*, 142 Fed. Cl. at 424 (explaining that there were three lower-priced, technically acceptable bids between Ansible's and Eskridge's bids); *see also Int'l Bus. Machs.*, 892 F.2d at 1010–11 (finding no direct economic interest where there is a lower-priced, technically acceptable bid). [5]

Second, Eskridge fails to allege prejudice sufficient to require the Contract to be rebid, which would have allowed Eskridge to compete again. A bidder has an economic interest and therefore standing to challenge a contract award where, "if the [bidder's] bid protest were allowed because of an arbitrary and capricious responsibility determination by the contracting officer, the government would be obligated to rebid the contract, and [the bidder] could compete for the contract once again." *Impresa*, 238 F.3d at 1334. Outside of its contention that the Army failed to conduct a compensation realism analysis, Eskridge does not allege alternate grounds which, if true, would require rebidding. *See generally* Appellant's Br. *Cf. Info. Tech.*, 316 F.3d at 1319 (determining that a disappointed bidder established the requisite prejudice for standing, as the party was a qualified bidder whose proposal met minimum contract requirements and "its chances of securing the contract increased if the problem [alleged] . . . was cured").

Eskridge's counterarguments are unavailing. Eskridge contends that it would have a chance of being awarded the Contract, because its challenge encompasses

---

[5]   To the extent that Eskridge is protesting the terms of the 2018 Solicitation, such a challenge is untimely. *See Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007) (holding that a party waives the ability to object to the terms of a solicitation if it fails to do so before the close of the bidding process).

all four lower-priced bidders due to the Army's improper determination that they were technically acceptable when they were in fact deficient.  *See* Appellant's Br. 18 ("[T]he Army committed substantial errors by failing to adhere to evaluation criteria pertaining to retention and recruiting of CRNAs," "which allowed four bidders to submit wage rates and pricing wholly inadequate to retain and recruit CRNAs in the latter option years of the contract[.]").  Specifically, Eskridge asserts—notably without providing record support—that the 2018 Solicitation required that "wage rates must increase proportionally per option year at a percentage necessary to maintain and sustain the workforce throughout the life of the contract."  *Id.* at 19.

This argument fails, hinging on a faulty premise:  For Eskridge's argument to prevail, the 2016 Solicitation's price realism analysis requirement—which Eskridge suggests would engender the need for proportional and annual wage increases—must have been imputed into the 2018 Solicitation.  It was not incorporated.  The Army specified that in the 2018 Solicitation, it had removed the 2016 Solicitation's price realism analysis requirement and, in its place, added the minimum compensation rate requirement.  *See Eskridge*, 142 Fed. Cl. at 414 ("[T]he Army made th[e] [minimum compensation rate] addition because the prior iteration of this procurement—unlike the current one—incorporated price realism in a best value trade-off analysis."); *see* J.A. 171 (2018 Solicitation) (setting the initial "minimum acceptable provider wage rate" at $113.84 (capitalization altered)), 159–72 (2018 Solicitation) (providing for no annual wage increase in option years).  All four of the lower-priced bids met the compensation rate requirement, *see Eskridge*, 142 Fed. Cl. at 414–15; *see also* J.A. 861–65, and so the Court of Federal Claims did not err in determining the bids were technically acceptable on that basis, *see Int'l Bus. Machs.*, 892 F.2d at 1011 (explaining that, where every bidder "offers essentially the same [bid,] . . . materially differ[ing] only as to price, the

solicitation itself is not challenged, and there is no reason to believe that the second-lowest bid is not responsive, only the second-lowest bidder has a direct economic interest").

Similarly, Eskridge's claim that the Army erred by rating the four lower bidders as technically acceptable—despite their offering of wage rates that "fall[] below the median rate established by the IGE" for two option years—is flawed. Appellant's Br. 21. The compensation realism analysis specified in the 2018 Solicitation requires the Army to measure each bid's price against the minimum hourly rate provided for, which the Army did. *See Eskridge*, 142 Fed. Cl. at 422. In contrast, the IGE analysis is used to determine whether each bidder's pricing was "[f]air and reasonable." *Id.* at 419 (citation omitted); *see* J.A. 859 (2018 Solicitation Source Selection Decision Document) ("Fair and reasonable pricing can be determined by comparison to the [IGE]."). Compensation realism analysis evaluates whether a proposed compensation is too low, *Eskridge*, 142 Fed. Cl. at 423, while the fair and reasonable analysis determines if it is too high. *See Triad Int'l Maint. Corp.*, B-408374, 2013 WL 4854436, at *7 (Comp. Gen. Sept. 5, 2013) (citing *Milani Constr., LLC*, B-401942, 2010 CPD ¶ 87 at 4 (Comp. Gen. Dec. 22, 2009)). For the reasons stated above, the Army did not err in its compensation realism analysis. Accordingly, because Eskridge failed to demonstrate a direct interest, it does not have standing to protest.

## CONCLUSION

We have considered Eskridge's remaining arguments and find them unpersuasive. Accordingly, the Judgment of the U.S. Court of Federal Claims is

## **AFFIRMED**